Case Nos. 26-4688 & 26-4704

**NOT SCHEDULED FOR ORAL ARGUMENT**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

STATE OF HAWAIʻI,

*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY

*Respondent*.

NATIONAL PARKS CONSERVATION ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, and COALITION TO PROTECT AMERICA'S NATIONAL PARKS,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as U.S. Environmental Protection Agency Administrator,

*Respondents*.

On Petition for Review of a Final Agency Action of the United States Environmental Protection Agency, 91 Fed. Reg. 31941 (May 29, 2026)

# OPENING BRIEF OF PUBLIC INTEREST ORGANIZATION PETITIONERS

Abirami Vijayan
Sarah A. Buckley
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 836-9866
avijayan@nrdc.org
sbuckley@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

Christopher A. Meyer
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(917) 410-8753
cmeyer@earthjustice.org

*Counsel for Petitioners National Parks Conservation Association, Sierra Club, and Coalition to Protect America's National Parks*

*Additional Counsel listed on inside cover*

Isaac H. Moriwake
Earthjustice
850 Richards St., Suite 400
Honolulu, HI 96813
(808) 599-2436
imoriwake@earthjustice.org

Benjamin Chagnon
Earthjustice
1250 I St. NW, Floor 4
Washington, DC 20005
(202) 745-5210
bchagnon@earthjustice.org

*Counsel for Petitioners National Parks Conservation Association, Sierra Club, and Coalition to Protect America's National Parks*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

JURISDICTIONAL STATEMENT .......... 4

STATUTES AND REGULATIONS .......... 4

ISSUES PRESENTED .......... 4

STATEMENT OF THE CASE .......... 5

I. Statutory and Regulatory Background .......... 5

II. Factual Background .......... 10

A. The Initial 2022 SIP .......... 11

B. The Revised 2024 SIP .......... 14

C. Hawaiian Electric's Attempt to Derail the 2024 SIP .......... 15

D. EPA's Partial Disapproval of the 2024 Revised SIP .......... 17

STANDING .......... 19

STANDARD OF REVIEW .......... 23

SUMMARY OF THE ARGUMENT .......... 23

ARGUMENT .......... 25

I. EPA arbitrarily disapproved the retirements at Hill and Kahului based on a purported lack of necessary assurances that the retirements would not be prohibited by State or Federal law. .......... 25

A. EPA's conclusion that the retirements might violate the Takings Clause was arbitrary and capricious. .......... 27

1. EPA arbitrarily concluded that the proposed retirements were "forced." .......... 28

2. EPA entirely overlooked the just-compensation element of a Takings Clause violation. .......... 34

B. EPA arbitrarily disregarded Hawai'i's assurances that the retirements would not violate the Takings Clause. .......... 40

C. EPA failed to consider how disapproving a retirement deadline based on the mere possibility of a Takings Clause violation would undermine the structure and goals of the Clean Air Act. .......... 43

II. EPA arbitrarily rejected the rest of the SIP's long-term strategy based on supposed flaws with the Hill and Kahului retirements. .......... 50

A. EPA did not explain why it disapproved control measures at non-retiring facilities and facilities that Hawaiian Electric does not own. .......... 51

B. EPA did not respond to significant comments noting that its disapproval was overbroad. .......... 54

III. Vacatur is the appropriate remedy. .......... 55

CONCLUSION .......... 58

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*All. for the Wild Rockies v. Higgins*,
183 F.4th 671 (9th Cir. 2026) ....................................39, 40–42, 49, 54, 55

*Am. Mining Cong. v. EPA*,
965 F.2d 759 (9th Cir. 1992) ..........................................................39, 54

*Am. Sec. Ass'n, Citadel Sec. LLC v. SEC*,
147 F.4th 1264 (11th Cir. 2025)............................................................ 57

*Arizona ex rel. Darwin*,
815 F.3d 519 (9th Cir. 2016) ..........................................................10, 23

*Ass'n of Irritated Residents v. EPA*,
10 F.4th 937 (9th Cir. 2021) ................................................................ 21

*Bethlehem Steel Corp. v. EPA*,
638 F.2d 994, (7th Cir. 1980) ............................................................. 43

*Bunker Hill Co. v. EPA*,
572 F.2d 1286 (9th Cir. 1977)............................................................... 43

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) .............................................................. 56

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) ................................................................ 56

*Duquesne Light Co. v. Barasch*,
488 U.S. 299 (1989)............................................................................... 39

*Florida Power & Light Co. v. Costle*,
650 F.2d 579 (5th Cir. 1981) ............................................................... 22

*Gresham v. Azar*,
950 F.3d 93 (D.C. Cir. 2020)............................................................... 42

*Idaho Conservation League v. Bonneville Power Admin.*,
83 F.4th 1182 (9th Cir. 2023) ............................................................. 20

*In re Maui Elec. Co.*,
506 P.3d 192 (Haw. 2022)................................................................... 33

*Int'l Partners for Ethical Care Inc. v. Ferguson*,
146 F.4th 841 (9th Cir. 2025) ............................................................. 19

*Kaweah Delta Health Care Dist. v. Becerra*,
123 F.4th 939 (9th Cir. 2024) ............................................................. 57

*Knick v. Township of Scott*,
588 U.S. 180 (2019)............................................................................. 35

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)............................................................................. 53

*Los Padres ForestWatch v. U.S. Forest Serv.*,
25 F.4th 649 (9th Cir. 2022) ............................................................... 36

*Luminant Gen. Co. LLC v. EPA,*
714 F.3d 841 (5th Cir. 2013) .........................................................51, 53

*Michigan v. EPA*,
576 U.S. 743 (2015)............................................................................. 53

*Montana Wildlife Fed. v. Haaland*,
127 F.4th 1 (9th Cir. 2025).................................................................. 56

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..........................................23, 29, 31, 34, 42, 43, 51, 53

*Mountain Water Co. v. Montana Dep't of Pub. Serv. Regul.*,
919 F.2d 593 (9th Cir. 1990) ....................................................37, 38

*Nat'l Park Serv. v. Nat'l Trust for Hist. Pres. in the U.S.*,
609 U.S. 1068 (2026) ............................................................................ 20

*Nat'l Urb. League v. Ross*,
977 F.3d 770 (9th Cir. 2020) ....................................................44, 49

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025)............................................................. 19

*NetCoalition v. SEC*,
615 F.3d 525 (D.C. Cir. 2010)............................................................. 30

*North Pacifica LLC v. City of Pacifica*,
526 F.3d 478 (9th Cir. 2008) ............................................................... 35

*Or. Nat. Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996) ................................................................. 44

*Penn Central Transp. Co. v. New York City*,
438 U.S. 104 (1978) .............................................................................. 41

*Port of Seattle v. FERC*,
499 F.3d 1016 (9th Cir. 2007)............................................................... 38

*Presidio Golf Club v. Nat'l Park Serv.*,
155 F.3d 1153 (9th Cir. 1998)............................................................... 22

*Renee v. Duncan*,
686 F.3d 1002 (9th Cir. 2012)............................................................... 22

*Seaboard Air Line Ry. Co. v. United States*,
261 U.S. 299 (1923) .............................................................................. 34

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014) .......... 36

*Susquehanna Int'l Grp. v. SEC*,
866 F.3d 442 (D.C. Cir. 2017) .......... 30, 31

*Texas v. EPA.*,
690 F.3d 670 (5th Cir. 2012) .......... 44, 47, 56

*Train v. Nat. Res. Def. Council, Inc.*,
421 U.S. 60 (1975) .......... 48

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014) .......... 36

*WildEarth Guardians v. EPA*,
759 F.3d 1064 (9th Cir. 2014) .......... 21

**Statutes**

5 U.S.C. § 706(2) .......... 23

42 U.S.C. § 7410(a)(1) .......... 10

42 U.S.C. § 7410(a)(2) .......... 10

42 U.S.C. § 7410(a)(2)(A) .......... 7, 8, 45

42 U.S.C. § 7410(a)(2)(E) .......... 10, 27, 46

42 U.S.C. § 7410(a)(2)(E)(i) .......... 2, 3, 10, 18, 24, 26, 27, 40, 44

42 U.S.C. § 7410(a)(2)(H) .......... 10

42 U.S.C. § 7410(a)(2)(M) .......... 10

42 U.S.C. § 7410(c)(1) .......... 10, 43, 57

42 U.S.C. § 7410(c)(1)(B) .......... 53

42 U.S.C. § 7410(g)(1) .......... 8, 9, 30, 45, 48

42 U.S.C. § 7410(k)(3) .......... 10, 40

42 U.S.C. § 7472(a) .......... 5

42 U.S.C. § 7491(a)(1) .......... 5

42 U.S.C. § 7491(a)(2) .......... 5

42 U.S.C. § 7491(a)(4) .......... 6

42 U.S.C. § 7491(b)(1) .......... 6

42 U.S.C. § 7491(b)(2) .......... 6, 7

42 U.S.C. § 7491(g)(1) .......... 6, 8, 30, 48

42 U.S.C. § 7602(q) .......... 7

42 U.S.C. § 7607(b)(1) .......... 4

**Regulations**

40 C.F.R. § 51.308(d)(3)(iv) .......... 7

40 C.F.R. § 51.308(d)(3)(v)(D) .......... 8, 45

40 C.F.R. § 51.308(f)(2) .......... 9

40 C.F.R. § 51.308(f)(2)(i) .......... 7, 30

40 C.F.R. § 51.308(f)(2)(iv)(C) .......... 8, 45

40 C.F.R. § 51.308(f)(3)(i) .......... 9

40 C.F.R. § 51.308(i) .......... 9

**Federal Register Notices**

64 Fed. Reg. 35714 (July 1, 1999) .......... 6

82 Fed. Reg. 3078 (Jan. 10, 2017) .......... 7

90 Fed. Reg. 31926 (July 16, 2025) .......... 47

91 Fed. Reg. 31941 (May 29, 2026)... 4, 19, 26–28, 36, 40–42, 44–46, 50, 52, 53

91 Fed. Reg. 34589 (June 8, 2026) .......... 47

91 Fed. Reg. 7204 (Feb. 17, 2026).......... 11, 12, 17, 18, 52, 53

**Other Authorities**

H.R. Rep. No. 95-294 (1977) .......... 5

Haw. Pub. Utils. Comm'n, Gen. Order No. 7 § 5.3.a .......... 33

Nat'l Park Serv., U.S. Dep't of the Interior, *National Park System and Affiliated Areas* (1977) .......... 6

## INTRODUCTION

Air pollution has long marred the beauty of America's national parks. Fossil-fuel-fired power plants discharge pollutants—including sulfur oxides, nitrogen oxides, and particulate matter—that are not only dangerous to human health, but also chemically react to form haze, which obscures the park vistas that attract millions of visitors per year. Congress sought to address that problem through the Clean Air Act's regional haze program, which requires each State to develop reasonable and enforceable measures for reducing haze in the national parks within that State's borders. Each State memorializes those measures in a state implementation plan (SIP), which the Environmental Protection Agency (EPA) must approve if it comports with the Clean Air Act's basic requirements.

This case is about EPA's improper partial disapproval of one such SIP solely at the behest of a regulated utility. In 2021, the Hawaiian Electric Company proposed to retire select boilers at two of the State's biggest emitters of haze-forming pollution: a pair of aging oil-fired power plants on Maui and Hawaiʻi Island. At the utility's request, the State incorporated those proposed retirements into its 2024 SIP, which targeted haze-forming pollution at Haleakalā National Park and Hawaiʻi Volcanoes National Park. This was a routine exercise of the State's statutory authority: Both the Clean Air Act and

its implementing regulations expressly contemplate enforceable retirements as a tool for reducing haze-forming emissions.

But one year later, after a turnover in EPA leadership, Hawaiian Electric abruptly reversed course. It requested that EPA disapprove the SIP, asserting for the first time that it had been "forced" to accept the retirements, and that they could threaten grid reliability in Hawai'i. Hawaiian Electric thus invited EPA to second-guess Hawai'i's reasonable exercise of its Clean Air Act authority based on eleventh-hour concerns that it never raised during the SIP drafting process.

EPA obliged. But it did not just disapprove the retirements—it scuttled Hawai'i's entire pollution control strategy in the 2024 SIP, including non-retirement measures and measures for a facility that Hawaiian Electric does not own. To justify its sweeping action, the agency latched onto an obscure provision of the Clean Air Act that requires States to offer "necessary assurances" that nothing in a SIP is "prohibited by" Federal or State law. 42 U.S.C. § 7410(a)(2)(E)(i). Because Hawaiian Electric had purportedly revoked its consent to the retirements, EPA reasoned, any attempt to enforce those retirements *might* violate the Takings Clause—a violation that EPA concluded could render the retirements "prohibited by" Federal or State law. According to EPA, Hawai'i did not offer the necessary assurances that this theoretical

Takings Clause violation would not arise.

EPA's contrived rejection of Hawai'i's proposed pollution controls cannot stand.

*First*, EPA's conclusion that the retirements might violate the Takings Clause—and that the mere possibility of such a violation meant the retirements could be disapproved as "prohibited by . . . State or Federal law," *id.*—was arbitrary and capricious. To conclude that the retirements might pose a Takings Clause problem, EPA uncritically accepted Hawaiian Electric's portrayal of the retirements as "forced," overlooked whether just compensation was available for the retirements, and entirely disregarded Hawai'i's assurances that no such Takings problem would arise. Furthermore, EPA's foundational conclusion that it could disapprove a retirement deadline simply because it *might* conflict with the Takings Clause was improper, because the agency never considered how such an approach would conflict with the goals and objectives of the Clean Air Act.

*Second*, the agency relied on its flawed objections to the retirements to reject every other control in the 2024 SIP—a textbook case of arbitrary overbreadth. The 2024 SIP's remaining control measures either pertain to facilities that Hawaiian Electric does not own, or do not contemplate facility retirement at all. So, EPA's Takings-based disapproval rationale simply does

not apply to those control measures—a point that EPA itself recognized with respect to at least one facility described in the 2024 SIP.

This Court should vacate EPA's partial disapproval.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to Section 307(b)(1) of the Clean Air Act, which states that a petition for review of a SIP partial disapproval "may be filed only in the United States Court of Appeals for the appropriate circuit." 42 U.S.C. § 7607(b)(1). EPA published notice of its final partial disapproval on May 29, 2026, *see* 91 Fed. Reg. 31941, and the Public Interest Organizations timely sought review on July 22, 2026. *See* Pet. for Review, No. 26-4704, Dkt. No. 1.1; 42 U.S.C. § 7607(b)(1).

## STATUTES AND REGULATIONS

Pertinent statutes, regulations, and legislative history appear in the accompanying addendum.

## ISSUES PRESENTED

1. Whether EPA acted unlawfully when it disapproved retirement deadlines for two facilities in Hawai'i's 2024 SIP, based on speculation that the retirement deadlines might violate the Takings Clause at some unspecified point in the future.

2. Whether EPA acted unlawfully when it relied on its rejection of the

retirement deadlines to disapprove every control measure in Hawai'i's 2024 SIP, including control measures that—by EPA's own admission—did not implicate the Takings Clause at all.

## STATEMENT OF THE CASE

### I. Statutory and Regulatory Background

America's national parks are places of irreplicable beauty. But almost fifty years ago, Congress recognized that these parks faced a "serious problem." H.R. Rep. No. 95-294, at 204 (1977). Man-made pollution was obscuring the "breathtaking panorama[s]" that attracted millions of visitors to the parks every year. *Id.* The main haze-forming pollutants were—and still are—sulfur oxides, nitrogen oxides, and particulate matter, all of which are emitted by fossil-fired power plants. *Id.*

So, Congress enacted the Clean Air Act's regional haze program to address, and ultimately eliminate, "impairment of visibility . . . result[ing] from manmade air pollution" in "mandatory class I Federal areas" where "visibility is an important value of the area." 42 U.S.C. § 7491(a)(1)–(2). Class I areas include national parks that were larger than 6,000 acres as of August 1977—a category that includes Haleakalā National Park and Hawai'i Volcanoes National Park, as well as more expansive parks like Yosemite National Park in California and smaller parks like Mesa Verde National Park in Colorado. *Id.*

§ 7472(a); Nat'l Park Serv., U.S. Dep't of the Interior, *National Park System and Affiliated Areas* 30, 32, 38 (1977).

Congress envisioned that EPA and the States would both play a role in eliminating visibility impairment caused by man-made pollution. It directed EPA to begin by "promulgat[ing] regulations to assure . . . reasonable progress" toward eliminating visibility-impairing pollution in Class I areas. 42 U.S.C. § 7491(a)(4). Congress also outlined four statutory factors for assessing "reasonable progress." An emission-reduction measure is necessary to achieve reasonable progress if it justified in light of (1) the cost of the measure, (2) the time required to adopt and install the measure, (3) the energy and non-air quality environmental impacts of the measure, and (4) the remaining useful life of the source. *See id.* § 7491(g)(1).

Although EPA "provide[s] guidelines" on "appropriate techniques" for implementing the regional haze program, *id.* § 7491(b)(1), States take the lead in selecting the measures necessary to achieve reasonable progress, *id.* § 7491(b)(2); *accord* 64 Fed. Reg. 35714, 35760 (July 1, 1999) (Regional Haze Rule) ("States bear the primary responsibility for establishing reasonable progress."). States fulfill this responsibility by developing SIPs, which contain "such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress" toward nationwide elimination of

man-made haze. 42 U.S.C. § 7491(b)(2). States submit a new SIP for each ten-year "implementation period," the first of which began in 2008 and ended in 2018. *See* 82 Fed. Reg. 3078, 3080–82 (Jan. 10, 2017). The second implementation period, from 2018 to 2028, is the one at issue in this case. *Id.* at 3080.

States develop SIPs in four steps that are relevant here.

*First*, the State identifies the pollution sources—or categories of sources—that impair visibility in the Class I areas within the State. 40 C.F.R. § 51.308(d)(3)(iv), (f)(2)(i). The State must explain how it identified these sources, *see id.* § 51.308(f)(2)(i), though it has "flexibility and discretion" in selecting which sources to consider. 5-ER-0839. For example, a State may consider sources with the highest baseline emissions, sources with the fewest existing control measures, or sources that are closest to the relevant Class I areas. 5-ER-0828–29.

*Second*, the State selects enforceable emission-reduction measures for each source or source category. 42 U.S.C. §§ 7410(a)(2)(A), 7491(b)(2).[1] The

[1] Section 7491(b)(2) uses the term "applicable implementation plan" to describe a regional haze program SIP. The Clean Air Act states that the requirements for an "applicable implementation plan" appear in Section 7410. *See* 42 U.S.C. § 7602(q). So, Sections 7410 and 7491 jointly govern regional haze program SIPs.

State has some leeway in selecting these measures, and it may include any "enforceable emission limitations and other control measures, means, or techniques . . ., as well as schedules and timetables for compliance, as may be necessary or appropriate" to achieve reasonable progress. 42 U.S.C. § 7410(a)(2)(A). To determine if a given measure is "necessary" to achieve reasonable progress, the State must apply the above-mentioned four factors set out in Section 7491(g)(1): the cost of the measure, the time necessary to adopt and install the measure, the measure's energy and non-air environmental effects, and the remaining useful life of the relevant facility.

One way to reduce emissions is to require facilities to adopt better operational practices or technology-based controls. Another is for polluting facilities to retire—either partially or entirely. Indeed, both the Clean Air Act and its implementing regulations expressly contemplate enforceable retirements. *See, e.g.*, 40 C.F.R. § 51.308(d)(3)(v)(D) (requiring States to consider "source retirement and replacement schedules" as part of developing a long-term strategy); *id.* § 51.308(f)(2)(iv)(C) (same); 42 U.S.C. § 7410(g)(1) (authorizing States to temporarily suspend SIP-imposed retirement deadlines in certain circumstances). Retiring a source can significantly reduce emissions, allowing a State to make progress toward the statutory regional haze goals.

An enforceable retirement date can also ultimately benefit the source

operator by obviating the operator's obligation to install pollution controls before retirement. As EPA guidance explains, an enforceable retirement deadline shortens a facility's "remaining useful life." 5-ER-0839–40; 42 U.S.C. § 7410(g)(1). This means other pollution control measures at that facility are less likely to be justified under the four-factor reasonable progress standard described above, partially because there are fewer years over which to amortize the costs of new controls. 5-ER-0839. As such, under existing EPA guidance, an enforceable retirement date can justify a State's decision not to select a facility for analysis, or not to implement any other technology-based control measures at a facility during a given implementation period. 5-ER-0839, 0853.

The State's suite of reasonable emission-reduction measures forms a key component of its "long-term strategy." *See* 40 C.F.R. § 51.308(f)(2). States must consult with the federal land manager for each relevant Class I area when crafting their long-term strategy, and they must address land manager feedback in their SIPs. *See id.* § 51.308(i).

*Third*, based on the expected emission reductions from the long-term strategy, the State determines its "reasonable progress goals" for the implementation period. *Id.* § 51.308(f)(3)(i). The reasonable progress goals reflect the visibility improvements that will result from the emission-reduction measures in the long-term strategy. *Id.*

*Fourth*, the State submits the SIP to EPA for approval. 42 U.S.C. § 7410(a)(1). If the SIP is "consisten[t] with the statute and [its implementing] regulations," then the agency must approve it. *Arizona ex rel. Darwin*, 815 F.3d 519, 525 (9th Cir. 2016); 42 U.S.C. § 7410(k)(3).

EPA's review focuses on whether the SIP complies with the substantive requirements of the Clean Air Act and the Regional Haze Rule, *see id.* § 7410(k)(3), such as the requirement to include reasonable and enforceable emission-reduction measures, *id.* § 7410(a)(2). EPA also reviews whether the SIP satisfies certain procedural provisions. *E.g.*, *id.* § 7410(a)(2)(E), (H), (M). One such provision requires the State to offer "necessary assurances" that it (1) "will have adequate personnel, funding, and authority under State . . . law to carry out" the SIP, and (2) "is not prohibited by any provision of Federal or State law from carrying out" the SIP. *Id.* § 7410(a)(2)(E)(i).

EPA may approve the SIP in whole or in part. *Id.* § 7410(k)(3). If EPA partially or fully disapproves a SIP—or if a State fails to submit a SIP in a timely manner—the agency must promulgate a federal implementation plan (FIP) for the State within two years, unless it receives and approves a compliant SIP within that period. *Id.* § 7410(c)(1).

## II. Factual Background

There are two Class I areas in Hawaiʻi: Haleakalā National Park and

Hawai‘i Volcanoes National Park. 91 Fed. Reg. 7204, 7208 (Feb. 17, 2026). The former is on Maui, and the latter is on Hawai‘i Island. 3-ER-0358. These parks safeguard endemic native ecosystems found nowhere else on the planet, and feature some of the most inspiring mauka to makai (mountain to ocean) scenic views and landscapes in the country. 2-ER-0136–37. Haleakalā is home to more endangered and threatened species than any other park in the United States. 2-ER-0136. And Hawai‘i Volcanoes is both an International Biosphere Reserve and a UNESCO World Heritage Site. *Id.*

In October 2012, EPA promulgated a FIP for Hawai‘i to cover the first implementation period. 91 Fed. Reg. at 7208. The centerpiece of that plan was a cap on sulfur dioxide emissions at three oil-fired boilers on Hawai‘i Island. *Id.* Despite those efforts, visibility at Haleakalā improved only marginally compared to a 2004 baseline, and visibility remained essentially unchanged at Hawai‘i Volcanoes. 3-ER-0374, 0380–81.

Ahead of the second implementation period, Hawai‘i embarked upon the SIP drafting process and eventually submitted two plans to EPA: an initial SIP in 2022, and a revised SIP in 2024.

### A. The Initial 2022 SIP

Hawai‘i's SIP development began with a source screening analysis to identify pollutant sources on Hawai‘i Island and Maui that impair visibility at

Haleakalā and Hawai'i Volcanoes National Parks. That analysis identified four power plants owned by Hawaiian Electric as candidates for emission-reducing controls: Kanoelehua-Hill Generating Station (Hill), Kahului Generating Station (Kahului), Puna Generating Station (Puna), and Maalaea Power Plant (Maalaea). 4-ER-0704–05. It also identified a processing facility owned by the Mauna Loa Macadamia Nut Corporation (Mauna Loa). 4-ER-0705; 91 Fed. Reg. at 7209. Hawai'i then selected reasonable control measures for those sources through extensive consultations with Hawaiian Electric and EPA.

Hawaiian Electric was less than cooperative. With respect to Hill and Kahului—decades-old plants responsible for around 80–85% of facility-specific emissions affecting the two parks, *see* 3-ER-0420–21—Hawaiian Electric maintained that control measures were not necessary to achieve reasonable progress. The utility relied on a technical analysis that concluded additional control measures would be cost-ineffective. 4-ER-0504–06, 0511–13, 0516–18, 0571–73, 0580, 0585.

Hawai'i disagreed. Relying on EPA guidance, Hawai'i found that portions of Hawaiian Electric's technical analysis were flawed, and that when those flaws were corrected, Hawaiian Electric's analysis would show that certain control measures, like selective catalytic reduction, were in fact

cost-effective at Hill and Kahului. *See* 3-ER-0431–33; 4-ER-0521–23, 0587–91. Hawaiian Electric declined to amend its analyses. 3-ER-0430; 4-ER-0525–34, 0593–603. So, after soliciting guidance from EPA, Hawai‘i independently concluded that various technology-based controls and fuel switches at Hill and Kahului were necessary to achieve reasonable progress. 3-ER-0431–35, 0437–41.

In response, Hawaiian Electric proposed a new approach. Instead of installing the proposed controls, it would "commit[] to enforceable shut downs" of select boilers at Hill and Kahului by the end of 2027. 3-ER-0441. Hawai‘i accepted the proposal. 4-ER-0650; 3-ER-0288–89. In consultation with EPA, and at Hawaiian Electric's request, Hawai‘i added the deadlines to the 2022 SIP. 3-ER-0288–89. Because the deadlines called for the Hill and Kahului boilers to retire before the end of the second implementation period, the State concluded—citing EPA guidance—that no additional control measures were necessary at either facility for the rest of that period. 4-ER-0652.

In July 2022, just weeks before Hawai‘i's August 15 deadline to submit its SIP to EPA, Hawaiian Electric backtracked. It asked Hawai‘i to extend the retirement deadlines for Hill and Kahului to the end of 2028. 4-ER-0690–91. To justify this request, Hawaiian Electric cited correspondence in which EPA

had indicated that facility retirements could occur as late as the final year of the implementation period (*i.e.*, 2028). 4-ER-0690–91. Although the State objected to Hawaiian Electric waiting until the eleventh hour to request a change—the State's letter to Hawaiian Electric asserted that the utility had received the cited correspondence more than a year before it requested an extension—it agreed to consider the requested extension as part of a planned revision to the 2022 SIP. 4-ER-0644, 0693–94. The State was already planning to submit a SIP revision because control measures for two other sources, Maalaea and Mauna Loa, were "still being worked on" at the time of the 2022 SIP's submission deadline. 4-ER-0705.

Hawaiʻi submitted the 2022 SIP to EPA on August 11, 2022. 4-ER-0705–06. The SIP included the proposed 2027 retirement deadlines for Hill and Kahului, as well as additional control measures for Puna and Maalaea. 3-ER-0440, 0444. It did not contain controls for Mauna Loa, which would be included in the later planned SIP revision. 4-ER-0705.

### B. The Revised 2024 SIP

In August 2024, Hawaiʻi withdrew the 2022 SIP and submitted a revised SIP. 3-ER-0338. The 2024 SIP incorporated Hawaiian Electric's requested 2028 retirement deadlines for Hill and Kahului. And it incorporated both retirement deadlines and technology-based controls for the remaining

haze-emitting sources. At Maalaea, the plan required Hawaiian Electric to adopt fuel-injection requirements for two generators by 2027, and to either retire several other generators or to retrofit them with selective catalytic reduction technology by no later than 2037. 3-ER-0444–46. At Puna, the plan called for a switch to ultra-low-sulfur diesel. 3-ER-0443–44. And at Mauna Loa, the plan required retirement of the main boiler by the end of 2026. 3-ER-0446.

Shortly after Hawai‘i submitted the 2024 SIP to EPA, Hawaiian Electric asked for yet another extension of the plan's retirement dates for Hill and Kahului. This time, the utility requested that Hill and Kahului be allowed to engage in emergency backup operations through 2030 (for Kahului) and 2031 (for Hill). 3-ER-0306.

After consulting with EPA, Hawai‘i put its foot down. The State told Hawaiian Electric that revising its SIP, yet again, to incorporate Hawaiian Electric's latest proposal would unduly delay the SIP process and potentially risk the imposition of a FIP. 3-ER-0312. Nevertheless, Hawai‘i proposed to discuss further extending Hill and Kahului's retirement deadline during the third implementation period (*i.e.*, 2028–2038). *Id.*

### C. Hawaiian Electric's Attempt to Derail the 2024 SIP

In the summer of 2025, Hawaiian Electric shifted positions again, asking

Hawai‘i to “reassess” the Hill and Kahului retirements, arguing that they could threaten grid reliability. 3-ER-0324. In August 2025, Hawaiian Electric met with EPA without the State. 3-ER-0291. Shortly thereafter, Hawaiian Electric sent a letter to EPA stating its “concern” that the proposed retirements would not “allow for enough time to successfully procure and place in service replacement projects needed to maintain grid reliability and integrity.” 5-ER-0869. The August 2025 letter further suggested that Hawaiian Electric had been “forced” to accept retirement dates for Hill and Kahului based on the allegedly “high costs of controls and fuels switches,” and reasserted that no control measures whatsoever were appropriate at either facility. 5-ER-0868–69, 0871. Hawaiian Electric urged EPA to either request a supplemental SIP or disapprove Hawai‘i’s 2024 revised SIP. 5-ER-0868, 0878.

Hawaiian Electric’s grid reliability concerns were conspicuously absent from its previous and subsequent representations to State utility regulators. For instance, Hawaiian Electric’s 2023 integrated grid plan—overseen by the Hawai‘i Public Utilities Commission—committed to the Hill and Kahului retirements and did not indicate the retirements were likely to leave the utility with insufficient generation capacity. 5-ER-0762–63; 5-ER-0776–78. On the contrary, Hawaiian Electric stated that reducing reliance on obsolete fossil-fuel-fired plants like Hill and Kahului would “*improve* reliability” because those

plants were aging and prone to "higher outage rates." 5-ER-0760–64 (emphasis added); *see* 5-ER-0778.

And in January 2026, five months after Hawaiian Electric's August 2025 letter to EPA, Hawaiian Electric's annual reliability reports to the Hawai'i Public Utilities Commission maintained that energy generation would be adequate through the end of the decade, notwithstanding the 2028 retirement dates. *See* 2-ER-0201–10; 2-ER-0211–21; 2-ER-0222–40. Hawaiian Electric's reports explained that the loss of generation from Kahului would be mitigated by "planned generation and storage resource additions" on Maui. *See* 2-ER-0230. On Hawai'i Island, Hawaiian Electric predicted potential shortfalls in its "[r]eserve [m]argin"—*i.e.*, its target backup capacity for extraordinary contingencies—near the end of the decade, but it proposed a "portfolio approach" to minimize that risk, including "maintenance schedule optimization" and anticipated increased contributions from other resources. 2-ER-0219–20. Unlike Hawaiian Electric's letter to EPA, Hawaiian Electric's reports to its state utility regulators never suggested that the retirements should be delayed or suspended.

### D. EPA's Partial Disapproval of the 2024 Revised SIP

Seizing on Hawaiian Electric's August 2025 letter, EPA proposed in February 2026 to partially disapprove Hawai'i's 2024 revised SIP. 91 Fed.

Reg. at 7221. Specifically, the agency proposed to disapprove the revised SIP's *entire* long-term strategy, including every proposed control measure at every facility. *Id.* The proposed disapproval also included invalidating the State's reasonable progress goals and the consultation requirements associated with the long-term strategy. *Id.*

The agency offered two justifications for its proposed action. First, it relied on the Clean Air Act's requirement that a State provide "necessary assurances" that nothing in a SIP is "prohibited by any provision of Federal or State law." 91 Fed. Reg. at 7217 (quoting 42 U.S.C. § 7410(a)(2)(E)(i)). EPA proposed to find that the Hill and Kahului retirements could be "prohibited by . . . Federal or State law" because Hawaiian Electric's August 2025 letter indicated that the retirements were "forced," and that such retirements "could" amount to *per se* or regulatory takings in violation of the Federal constitution and "possibly comparable provisions of [S]tate law." 91 Fed. Reg. at 7214 (quotations omitted). EPA then proposed to conclude that it was required to disapprove those retirements because Hawai‘i had not provided the statutorily required "necessary assurances" that no such unlawful taking would occur. *Id.* at 7217 (citing 42 U.S.C. § 7410(a)(2)(E)(i)). Second, EPA proposed to conclude that "forced" source retirements were not statutorily permissible emission-reduction measures in the first place. *Id.* at 7218.

EPA finalized its partial disapproval on May 29, 2026, concluding that Hawai'i failed to provide necessary assurances that the enforceable Hill and Kahului retirements would not violate the Takings Clause or "possibly comparable provisions of State law." 91 Fed. Reg. at 31941–42. The agency abandoned its proposed conclusion that facility retirements are not permissible emission-reduction measures under the Clean Air Act. *Id.* at 31945–46.

This petition for review followed.

## STANDING

The Public Interest Organizations have standing to challenge EPA's partial disapproval of the 2024 SIP. An organization has associational standing if its members "would have standing to sue on their own," the "interest it asserts is germane to its purpose," and "neither the claim asserted nor the relief requested requires individualized proof." *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1013 (9th Cir. 2025) (internal quotations omitted).

The Public Interest Organizations each have at least one member that can sue in his or her own right. To show that a member may sue in his or her own right, a member must identify an "injury in fact" that (1) is "concrete and particularized" and "actual or imminent"; (2) "likely was caused or will be caused by the defendant"; and (3) "likely would be redressed" by a favorable decision. *Int'l Partners for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 847–48

(9th Cir. 2025) (quotations omitted). Members have identified recreational and health harms that meet this standard.

Members can demonstrate injury-in-fact by "aver[ring] that they use the affected area[s]," and that the partial disapproval will lessen the "recreational values of the area." *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1188 (9th Cir. 2023) (quotation omitted); *see also Nat'l Park Serv. v. Nat'l Trust for Hist. Pres. in the U.S.*, 609 U.S. 1068, 1072 (2026) (reaffirming standing based on injuries to "recreational interests" (citation omitted)).

Each Public Interest Organization has members that regularly visit one or both of Haleakalā and Hawaiʻi Volcanoes National Parks, and plan to do so again in the future. *See* ADD-002, ADD-006 ¶¶ 5, 15 (Raffin); ADD-014–15 ¶¶ 4, 12 (Riebeling); ADD-019 ¶¶ 8–9 (Gurung); ADD-024–026, ADD-033 ¶¶ 11–12, 16, 28 (Desai); ADD-036–38 ¶¶ 4, 13 (Sundergill); ADD-040–42 ¶¶ 6, 9 (Fritzke); ADD-048 ¶ 13 (Apo-Priest). During their visits, members hike or bike scenic trails, visit scenic overlooks, observe and study native flora and fauna, and picnic outside. *E.g.*, ADD-002–004 ¶¶ 6–10 (Raffin); ADD-014 ¶ 4 (Riebeling); ADD-019 ¶ 9 (Gurung) ADD-024–28 ¶¶ 12–13, 16–17, 19 (Desai); ADD-037 ¶¶ 7–8 (Sundergill); ADD-041 ¶ 7 (Fritzke); ADD-048–49 ¶¶ 13–16 (Apo-Priest). When hazy conditions diminish visibility in the parks, members either enjoy these recreational activities less, alter them, or abandon

them entirely. *E.g.*, ADD-003–007, ¶¶ 10–15 (Raffin); ADD-014 ¶ 7 (Riebeling); ADD-019 ¶ 10 (Gurung); ADD-025–28 ¶¶ 15, 18–20 (Desai); ADD-037–38 ¶¶ 9, 12–13 (Sundergill); ADD-041–42 ¶¶ 8–9 (Fritzke); ADD-049–50 ¶ 17 (Apo-Priest).

The members' declarations also allege injury-in-fact because they contain "credible allegations of respiratory distress . . . as a result of [haze-causing] pollution." *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021). Specifically, declarants suffer throat discomfort, worsened allergies, and exacerbated asthma symptoms when they visit the parks on hazy days. *See, e.g.*, ADD-020 ¶ 11 (Gurung); ADD-037 ¶ 10 (Sundergill); ADD-051 ¶ 20 (Apo-Priest).

The members' injuries are traceable to EPA's partial disapproval. Pollutants from the facilities covered by the SIP "contribute[] to visibility impairment at the national parks [the members] visit[]," and therefore cause the members' recreational injuries. *WildEarth Guardians v. EPA*, 759 F.3d 1064, 1072 (9th Cir. 2014); *see* 3-ER-0406–25 (source screening analysis). Moreover, these facilities emit haze-forming pollutants like nitrogen oxides, sulfur oxides, and particulate matter, *see* 3-ER-0409–10, 0420–21, all of which predictably cause or exacerbate respiratory ailments. *See* 2-ER-0194 (health effects of nitrogen dioxide); 2-ER-0196 (health effects of particulate matter);

2-ER-0198 (health effects of sulfur dioxide). By partially disapproving the SIP, EPA—at the very least—delayed federally enforceable control measures at the facilities with "the greatest potential to impair visibility," meaning the facilities most likely to injure the members. 3-ER-0421–22.

The members' injuries would likely be redressed by a favorable judgment, because vacatur would "significantly increase[] the likelihood" of favorable action by EPA on remand. *See Renee v. Duncan*, 686 F.3d 1002, 1014 (9th Cir. 2012). A judgment rejecting EPA's sole rationale for disapproving the entire long-term strategy would increase the odds that EPA approves that strategy on remand. *Cf. Florida Power & Light Co. v. Costle*, 650 F.2d 579, 581 (5th Cir. 1981) (EPA may not reject a SIP that "meets the statutory criteria").

The Public Interest Organizations also satisfy the remaining two prongs of the associational standing test. The interests at stake in this case, such as safe and healthy recreation in the national parks, are germane to the organizations' purposes. *See* ADD-009 ¶ 3 (Thompson); ADD-012 ¶¶ 3–4 (Trujillo); ADD-017–18 ¶ 3 (Gurung); ADD-022–23 ¶ 7 (Desai). Further, the claims in this case "are undifferentiated among members," and the "relief sought [*i.e.*, vacatur] . . . does not vary" as to each individual member "as it might were damages sought." *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998).

## STANDARD OF REVIEW

The Administrative Procedure Act governs review of SIP approvals and disapprovals. *See Arizona*, 815 F.3d at 530. Courts may "set aside" approvals or disapprovals that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). As relevant here, an action is arbitrary and capricious if an agency (1) "entirely fail[s] to consider an important aspect of the problem," (2) fails to "offer a 'rational connection between the facts found and the choice made,'" or (3) fails to "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 48, 52 (1983) (citations omitted).

## SUMMARY OF THE ARGUMENT

**I.** EPA arbitrarily disapproved the Hill and Kahului retirements based on a purported lack of necessary assurances that the retirements would not violate the Takings Clause.

**A.** EPA's conclusion that the retirements might violate the Takings Clause was arbitrary and capricious. At the outset, the agency's conclusion that the retirements were "forced" lacked support in the record. To reach this conclusion, EPA misinterpreted Hawaiian Electric's August 2025 letter describing the retirements as "forced," and improperly credited Hawaiian

Electric's self-serving claim that it could no longer consent to the retirements. Furthermore, the agency's rationale overlooked an important aspect of the problem, because it ignored whether Hawaiian Electric would receive just compensation for the retirements. EPA deepened this failure when it ignored record evidence that Hawaiian Electric had, in fact, already requested and received compensation for the retirements as early as September 2025.

**B.** In any event, Hawai‘i assured EPA that the retirements would not violate the Takings Clause, and EPA ignored those assurances. While the State explained that the retirements would not amount to *per se* or regulatory takings, EPA entirely failed to engage with the State's arguments. Instead, it simply asserted that the State's assurances were inadequate, without offering any basis, let alone a cogent explanation, as to why.

**C.** Even setting aside the flaws with its Takings analysis, EPA erred more fundamentally by concluding that it could—pursuant to Section 7410(a)(2)(E)(i) of the Clean Air Act—disapprove any retirement deadline that *might* trigger a Takings Clause violation. The agency overlooked an important aspect of the problem, because it never considered how this application of Section 7410(a)(2)(E)(i) undermined the stated objectives of the Clean Air Act. Specifically, EPA ignored how disapproving retirements based on speculative Takings concerns would undermine the enforceability of source retirements,

interfere with State discretion to select control measures, and discourage cost-effective means of achieving reasonable progress.

**II.** EPA's partial disapproval was also arbitrarily overbroad. While the agency's stated rationale concerned purported Takings Clause issues associated with the Hill and Kahului retirements, it never explained why that rationale justified disapproving control measures at non-retiring or non-Hawaiian Electric-owned facilities, and it therefore did not rationally exercise its discretion. The agency also failed to engage with comments identifying the overbreadth of its disapproval.

**III.** Vacatur is the appropriate remedy. EPA committed serious errors that pervade the partial disapproval. And vacating the final rule would be far less disruptive than mere remand.

## ARGUMENT

### I. EPA arbitrarily disapproved the retirements at Hill and Kahului based on a purported lack of necessary assurances that the retirements would not be prohibited by State or Federal law.

Hawai‘i's 2024 revised SIP included enforceable retirement deadlines for select boilers at Hill and Kahului. Both plants are major contributors of haze-forming pollution in Hawai‘i's national parks, 3-ER-0420–21, and the retirement deadlines helped ensure that the State could make reasonable progress toward the elimination of haze in its national parks.

But EPA disapproved the Hill and Kahului retirements based on an obscure provision of the Clean Air Act, concluding that Hawai‘i had failed to provide "necessary assurances" that the retirements were "not prohibited by any provision of Federal or State law." 42 U.S.C. § 7410(a)(2)(E)(i); 91 Fed. Reg. at 31941–45. Specifically, EPA reasoned that the retirements could violate a "provision of Federal or State law"—the federal Takings Clause or its Hawai‘i analogue—because the retirements became "forced" when Hawaiian Electric purportedly "withdrew its consent" in its August 2025 letter. 91 Fed. Reg. at 31943 (quoting 42 U.S.C. § 7410(a)(2)(E)(i)). EPA then partially disapproved the SIP because it maintained that Hawai‘i failed to provide "the necessary assurances that . . . these unconsented source closure[s] would not amount to a taking without just compensation." *Id.*

EPA's analysis was flawed in three ways. *First*, EPA's conclusion that the retirements might violate the Takings Clause was arbitrary and capricious. § I.A. *Second*, Hawai‘i provided assurances in its comment letter that the 2024 SIP was lawful, which EPA arbitrarily dismissed with little to no explanation. § I.B. *Third*, EPA never considered how disapproving a retirement deadline based on the speculative possibility that a retirement might violate the Takings Clause was inconsistent with the stated objectives of the Clean Air Act.

### A. EPA's conclusion that the retirements might violate the Takings Clause was arbitrary and capricious.

EPA could not disapprove the SIP, even in part, unless it concluded that the enforceable retirements at Hill and Kahului were "prohibited by" State or Federal law. 42 U.S.C. § 7410(a)(2)(E)(i). Here, EPA reasoned that the retirements threatened a violation of the Takings Clause and therefore might be "prohibited by" Federal or State law. 91 Fed. Reg. at 31944. Notably, EPA declined to conclude that the retirements *would* violate the Takings Clause. *See id.* at 31942. It was enough, in EPA's view, that "*potential* violation[s]" of the Takings Clause might arise if the retirements were enforced over Hawaiian Electric's objection. *Id.* (emphasis added).

In concluding that the retirements might violate the Takings Clause, and that they might therefore be "prohibited by" Federal or State law, EPA overlooked key aspects of the record. Hawai'i maintains that EPA exceeded its statutory authority because a "violation" of the Takings Clause cannot "prohibit" the State from carrying out its SIP under Federal or State law. State Br. § VII.A.2; *see* 42 U.S.C. § 7410(a)(2)(E). But even under EPA's preferred reading of the Clean Air Act—*i.e.*, that the mere potential for a Takings Clause violation can render a SIP provision "prohibited by . . . Federal or State law"—its conclusion was arbitrary and capricious.

*First*, EPA's conclusion that there might be a Takings violation depended

on its claim that the retirements were "forced." 91 Fed. Reg. at 31942–43. But the only evidence EPA cited—Hawaiian Electric's August 2025 letter—does not support this claim, particularly considering other record evidence EPA ignored. § I.A.1. *Second*, EPA ignored an important aspect of the problem, because it failed to consider a necessary element of a Takings violation—the absence of just compensation from the State—despite record evidence showing that the State had, in fact, provided compensation. § I.A.2.

#### 1. EPA arbitrarily concluded that the proposed retirements were "forced."

The foundational premise for EPA's conclusion that the Hill and Kahului retirements could violate the Takings Clause was that the retirements were "forced." 91 Fed. Reg. at 31941, 31943. EPA reached that conclusion solely by citing the August 2025 letter from Hawaiian Electric, by which the utility supposedly "withdrew its consent" to the retirements. *Id.* at 31943; *see* 3-ER-0291–92. In crediting that supposed withdrawal, EPA recited the two justifications Hawaiian Electric offered in the letter for revoking its consent: (1) that it had been "forced under the SIP to accept enforceable retirement deadlines . . . due [to] the high costs of controls and fuels switches," and (2) that the deadlines were "no longer acceptable because of potential negative impacts to generation reliability." 5-ER-0868; 91 Fed. Reg. at 31943 & nn.8–12 (citing only the two justifications in the August 2025 letter). EPA's decision

to rely solely on this letter to conclude that Hawaiian Electric had revoked its consent to the retirements—and that the retirements were therefore “forced”—was arbitrary and capricious in three ways.

At the threshold, EPA failed to reasonably explain how Hawaiian Electric’s August 2025 letter itself shows that the State “forced” Hawaiian Electric to accept the retirements. Nothing on the face of the letter supports that conclusion. *See State Farm*, 463 U.S. at 42 (agency must draw a “rational connection between the facts found and the choice made” (quotation omitted)). The letter does not say that retirement was the only compliance option Hawaiʻi would have accepted, such that it had been “forced” upon Hawaiian Electric by the State. Rather, Hawaiian Electric asserts that it had been “forced under the SIP to accept enforceable retirement deadlines” because they were cheaper than the ostensibly “high cost[]” emissions controls the State had previously found reasonable and cost-effective. 5-ER-0868; *see* 3-ER-0431–39.

In other words, Hawaiian Electric’s letter stated—and the record confirms—that unit retirement was cheaper than installing better pollution control technology, and that this economic assessment prompted Hawaiian Electric to propose the retirements. Hawaiian Electric’s letter did not object to being “forced” to accept the retirements. It objected to being “forced” to adopt

any compliance measures *at all*. Faced with the choice between controls and near-term retirement, Hawaiian Electric wanted a third option: *none of the above*. 5-ER-0871 (stating that neither retirements nor controls would be acceptable for Hawaiian Electric).

But none of the above was not an option. Neither EPA nor Hawai‘i has authority under the Clean Air Act to exempt Hill and Kahului—two of the largest contributors of haze-forming pollution in Hawai‘i's national parks—from the regional haze program where, as here, the State made undisputed findings that the facilities significantly contribute to regional haze, and that additional controls are necessary to achieve reasonable progress. *See* 3-ER-0413, 0441; 42 U.S.C. § 7491(g)(1); 40 C.F.R. § 51.308(f)(2)(i). Indeed, EPA has not concluded that the State's findings on this front were insufficient or improper.

Next, EPA acted arbitrarily by accepting—without any independent analysis—Hawaiian Electric's purported revocation of consent to the retirements. Agencies should be at their most circumspect when relying solely on the "self-serving" statements of a regulated entity. *See NetCoalition v. SEC*, 615 F.3d 525, 541 (D.C. Cir. 2010); *accord Susquehanna Int'l Grp. v. SEC*, 866 F.3d 442, 450 (D.C. Cir. 2017). Here, Hawaiian Electric's supposed revocation of consent was plainly self-serving, because it aimed to delay or

eliminate the SIP's regulatory requirements.[2] *E.g.*, 5-ER-0871 (declining to accept any control measures as necessary to achieve reasonable progress at Hill or Kahului). As such, before it could reasonably credit Hawaiian Electric's claimed revocation of consent, EPA had to "independent[ly] review," *Susquehanna*, 866 F.3d at 447 (quotation omitted), the two stated justifications for that revocation: (1) that the State had "forced" Hawaiian Electric to accept the retirements, and (2) that retirement of Hawaiian Electric's power plants would impermissibly threaten grid reliability. *See State Farm*, 463 U.S. at 43. EPA never did so, and it therefore acted arbitrarily. *See id.*

Finally, even if EPA had independently reviewed the August 2025 letter, it still could not have reasonably credited Hawaiian Electric's ostensible withdrawal of consent, because the utility's justifications for that withdrawal conflicted with the record evidence. Indeed, because EPA overlooked evidence that undercut *both* of Hawaiian Electric's purported rationales for withdrawing consent to the retirements, it failed to offer a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43

[2] Indeed, the August 2025 letter was just the latest in a series of self-serving efforts by HECO. Well before 2025, HECO had consistently taken steps to delay implementation of the SIP, such as declining to acknowledge errors with its four-factor analyses, 4-ER-0525–34, 0593–603, or requesting last-minute deadline extensions based on one-year-old correspondence with EPA. 4-ER-0689–90, 0693.

(quotation omitted).

Start with Hawaiian Electric's first rationale. The broader record confirms what the August 2025 letter recognized: The retirements were not forced on Hawaiian Electric by the State, but rather were Hawaiian Electric's idea in the first place. In October 2021, Hawaiian Electric proposed to shut down Hill and Kahului to avoid installing cost-effective control measures. 4-ER-0649. As the utility itself later described it, Hawaiian Electric "*agreed* to . . . the shutdown of several boilers at two of its generating facilities in lieu of air pollution control measures." 4-ER-0696 (emphasis added); *see also* 4-ER-0693 (Hawaiian Electric was "provided the option to either" shut down the boilers or install technology-based controls, and "chose to shut down the boilers."). The record thus reflects what Hawaiian Electric meant when it said the allegedly "high costs of controls and fuels switches" were what "forced" it to accept retirements. 5-ER-0868. In short, Hawaiian Electric accepted the shutdowns as its preferred cost-effective solution—not as a surrender to improper State pressure. Yet EPA entirely ignored this evidence.

EPA also ignored evidence undermining Hawaiian Electric's other justification for revoking its consent—its stated concerns about grid reliability. EPA could not reasonably credit Hawaiian Electric's newfound worries about grid reliability, given that the utility had omitted or downplayed such concerns

in its pre- and post-August 2025 filings with the Hawai‘i Public Utilities Commission, *i.e.*, the regulatory body *responsible for grid reliability*. *See In re Maui Elec. Co.*, 506 P.3d 192, 201 (Haw. 2022), *as corrected* (Mar. 3, 2022) (“The [Public Utilities Commission] must ensure the reliability of Hawai‘i’s electric system.”).

Two years after proposing to retire boilers at Hill and Kahului, Hawaiian Electric recognized that the retirements did not threaten grid reliability. Take its 2023 integrated grid plan. That plan committed to the Hill and Kahului retirements, presented analyses to demonstrate resource adequacy, and recognized that “[r]educing dependence on fossil fuel-based generators” like Hill and Kahului would “*improve* reliability given that [those generators] are currently more than 60 years old . . . and experiencing higher outage rates.” *See* 5-ER-0760–64; 5-ER-0776–78 (emphasis added). Nothing in the integrated grid plan suggested that the Hill and Kahului retirements should be delayed or cancelled.

The utility’s January 2026 adequacy-of-supply reports with the Public Utilities Commission are equally telling. 2-ER-0219, 0229. An adequacy-of-supply report assesses whether a utility has enough generation to meet forecasted demand. Haw. Pub. Utils. Comm’n, Gen. Order No. 7 § 5.3.a. In its 2026 reports, Hawaiian Electric maintained that Kahului and Hill would

retire on schedule and expressed none of the reliability concerns that appeared in its August 2025 letter to EPA. 2-ER-0217, 0219–20, 0229–30. In other words, when given the opportunity to raise its supposedly urgent grid reliability concerns with the very entity responsible for addressing those concerns, Hawaiian Electric stayed mum. If Hawaiian Electric were truly concerned that the retirements impermissibly threatened grid reliability, its adequacy-of-supply reports should have looked very different.

For all these reasons, EPA arbitrarily concluded that the retirements were "forced." And because EPA's Takings assertions rested on that arbitrary conclusion, those assertions fail on their own terms.

**2. EPA entirely overlooked the just-compensation element of a Takings Clause violation.**

EPA's Takings Clause rationale was arbitrary in another way. In concluding that the retirements might trigger Takings violations, EPA never recognized or discussed an indispensable requirement of a Takings Clause violation: the absence of just compensation. By failing to analyze the likelihood of this "necessary condition" of a Takings Clause violation, EPA ignored an important aspect of the problem. *See Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 305 (1923); *see also State Farm*, 463 U.S. at 43 (holding that an agency acts arbitrarily when it "entirely fail[s] to consider an important aspect of the problem"). To be sure, the State argues that the

retirements did not amount to *per se* or regulatory takings in the first place. State Br. §§ VII.B.2–3. But the Court need not address that issue to resolve this case: EPA's failure to even consider the just-compensation element of a Takings Clause violation is enough to render the partial disapproval arbitrary and capricious.

A Takings Clause violation consists of two essential components: (1) a taking of private property and (2) the absence of just compensation. *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019); *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 485 (9th Cir. 2008) ("[T]he Takings Clause itself prohibits only takings without just compensation."). So, EPA could not reasonably demand assurances about a potential Takings Clause violation without, at a minimum, explaining why Hawai'i might not compensate Hawaiian Electric for any supposed taking.

But the final rule lacked any analysis at all about just compensation—let alone the likelihood of Hawaiian Electric receiving it. At no point did EPA explain why Hawaiian Electric could not or would not be compensated. Nor did it explain why Hawaiian Electric could not remedy any potential Takings Clause violation by obtaining compensation through procedures provided under Hawai'i law. *Knick*, 588 U.S. at 191–93 ("A later payment of compensation" under State law can remedy an initially uncompensated

taking). While the final rule included scattered assertions that the proposed retirements could result in "uncompensated takings," 91 Fed. Reg. at 31944–45, the use of that conclusory label cannot substitute for actual analysis or explanation, *see Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022).

EPA's insistence that it was merely assessing the "risk" that a Takings violation may occur, and was not "adjudicating [Takings] claims," cannot excuse the gaps in its analysis. 91 Fed. Reg. at 31942. Even an agency's "predictive judgment" must be "based on some logic and evidence, not sheer speculation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (quoting *Verizon v. FCC*, 740 F.3d 623, 663 (D.C. Cir. 2014) (Silberman, J., concurring in part and dissenting in part)). Here, EPA did not offer even a scrap of analysis to suggest that the State might fail to provide just compensation to Hawaiian Electric. The agency's prediction that the retirements might violate the Takings Clause therefore overlooked an important—indeed, indispensable—aspect of a Takings Clause violation.

Furthermore, EPA's failure to consider whether compensation *might* be provided to Hawaiian Electric is especially striking given evidence showing that compensation already *had* been provided to Hawaiian Electric. In September 2025, eight months before the final rule, the Hawai'i Public Utilities

Commission approved Hawaiian Electric's request for accelerated depreciation and amortization rates for its power plants—rates that would reflect the shortened service lives of retiring facilities like Hill and Kahului. 2-ER-0252, 0264–66. According to Hawaiian Electric, this order would "help avoid the issue of stranded costs," *i.e.*, the need to "write off[] . . . undepreciated" investment in the early-retiring plants. 2-ER-0264–66; *see also* 2-ER-0264 n.63 (citing Kahului's proposed 2027 retirement date). In granting HECO's request, the Public Utilities Commission recognized that early retirements benefited utility customers by reducing emissions and increasing energy affordability and resilience. 2-ER-0264.

Because these kinds of ratemaking orders are the proper "recourse [for] a utility to obtain just compensation" for the "dedication of [its] private property to public use," *Mountain Water Co. v. Montana Dep't of Pub. Serv. Regul.*, 919 F.2d 593, 600 (9th Cir. 1990), EPA had to grapple with the September 2025 order before concluding that any uncompensated takings might occur. This is especially so given that Hawaiian Electric itself requested the rate allowance as compensation for the proposed early retirements. 2-ER-0248–53.

EPA acknowledged the September 2025 rate order in a brief footnote to its response-to-comments document, only to summarily (and arbitrarily) dismiss it. Though the rate order would seem to resolve the Takings concerns

animating EPA's partial disapproval, the agency shrugged it off by asserting that the State had never discussed the order in its SIP. 2-ER-0063 n.14. But the State had no occasion to do so. For one thing, the Public Utilities Commission filed the order more than one year after the State filed the 2024 SIP. For another, Hawaiian Electric's claim that it had revoked its consent to the retirements—the claim that formed the basis for EPA's specious Takings concerns—only emerged in August 2025. In short, EPA's response faulted the State for lacking the clairvoyance to pre-rebut a Takings concern that only surfaced a year *after* the 2024 SIP had been submitted to EPA.

EPA also stated that it did not have to evaluate the rate order, because the commenters had not shown that the "increased depreciation rates approved by the [Public Utilities Commission] constitute[d] 'just compensation' within the meaning of the Takings Clause." *Id.* But because the ratemaking process is how public utilities obtain compensation for the dedication of their property to public use, the order was pertinent evidence of compensation. *See Mountain Water*, 919 F.2d at 600. So, EPA had to explain why that evidence did not resolve its concern about an uncompensated taking. *See Port of Seattle v. FERC*, 499 F.3d 1016, 1035 (9th Cir. 2007) (holding that an agency must grapple with contrary evidence). Yet, instead of justifying its conclusion that the retirements could amount to uncompensated takings in light of the record

evidence, EPA simply faulted commenters for not *dis*proving that conclusion.[3]

EPA compounded the foregoing failures by ignoring public comments that identified those failures. An agency acts arbitrarily and capriciously if it "fails to consider and respond to 'significant' comments received during notice-and-comment rulemaking." *See All. for the Wild Rockies v. Higgins*, 183 F.4th 671, 685 (9th Cir. 2026) (citation omitted). Here, commenters flagged that (1) EPA lacked any record evidence indicating a risk of an uncompensated taking; and (2) the Public Utilities Commission had already provided for compensation via accelerated depreciation. *See* 2-ER-0119, 0124, 0157; 3-ER-0299–300. These were "significant" comments because they "raise[d] relevant points" that "if adopted, would require a change in the agency's proposed rule." *Am. Mining Cong. v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992). If EPA had acknowledged either point, its conclusion that the proposed retirements risked a Takings Clause violation would have been untenable, and its sole rationale for partially disapproving the 2024 SIP would have

[3] Even if EPA had chosen to analyze the order's sufficiency, it would have been necessary to conduct a contextual analysis. The "economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single [constitutionally] correct result." *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 314 (1989). So, EPA would have had to make findings of its own to know whether HECO was poised to receive a "fair rate of return given the risks under [Hawai'i's] rate-setting system." *Id.* at 310. Suffice it to say, EPA's failure to do any analysis whatsoever fell short of this bar.

disappeared. But EPA failed to grapple with either point, rendering the final rule arbitrary and capricious. *See Higgins*, 183 F.4th at 685.

### B. EPA arbitrarily disregarded Hawai‘i's assurances that the retirements would not violate the Takings Clause.

Even if EPA had reasonably predicted that the Hill and Kahului retirements might violate the Takings Clause (and it did not), it still could not partially disapprove the 2024 SIP without engaging with the State's contrary assurances that the retirements would comport with the Takings Clause. *See* 42 U.S.C. § 7410(a)(2)(E)(i), (k)(3). EPA concluded that it "became incumbent" on the State to provide such assurances after Hawaiian Electric "withdrew its consent" to the retirements, and that such assurances were not provided here. 91 Fed. Reg. at 31943. But Hawai‘i did, in fact, provide those assurances in its comment letter opposing the proposed partial disapproval. The agency simply ignored them.

Among other assurances, Hawai‘i explained its view that the retirements would not effect a taking of private property in the first place. The State argued that the retirements would not effect a *per se* taking because (1) they did not permit the government to seize real or personal property; (2) they did not authorize third parties or government officials to enter private land; (3) nothing in Hawai‘i law recognized the operation of a power plant as a "critical 'stick' in the bundle of rights that comprises real property"; and (4) a power plant

retirement would be best understood as a use restriction rather than a *per se* taking. 3-ER-0300. Hawai‘i also applied the factors outlined in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978), to explain why the proposed retirements would not amount to a regulatory taking. 3-ER-0300–01.

EPA acted arbitrarily by failing to grapple with Hawai‘i's assurances. *Higgins*, 183 F.4th at 685. The agency's decisional documents mention the State's assurances just twice, and neither reference is responsive.

First, in the final rule's discussion of *per se* takings, EPA says Hawai‘i "did not provide necessary assurances in the [SIP] that the enforceable closures . . . would not involve the type of property right deprivation at issue in *Cedar Point* [*Nursery v. Hassid*, 594 U.S. 139 (2021)]." 91 Fed. Reg. at 31944. On the contrary, Hawai‘i *did* explain why the retirements would not amount to *per se* takings—an explanation that expressly cited to the Supreme Court's decision in *Cedar Point*. 3-ER-0300. EPA never explained why it dismissed the State's explanation, relying instead on the mere assertion that the State did not provide assurances. 91 Fed. Reg. at 31944.

Second, EPA asserted that it also had not received necessary assurances that the retirements would not effect a regulatory taking. *Id*. at 31944–45. And while the agency acknowledged that the State had offered a different

account of how the *Penn Central* test would apply to the retirements at issue here, 2-ER-0068, it never engaged with the specific analysis that the State provided. *Compare* 3-ER-0300–03, *with* 91 Fed. Reg. at 31944–45, *and* 2-ER-0068–69. As just one illustrative example, the State observed that Hawaiian Electric's reasonable investment-backed expectations would have been shaped by the utility's own past efforts to retire obsolete power plants and move toward renewable energy. 3-ER-0301. EPA never engaged with this specific point, instead dismissing the State's *Penn Central* analysis out of hand. 2-ER-0068–69. EPA does not satisfy its obligation to address significant comments when it simply "[n]od[s] to concerns raised by commenters[,] only to dismiss them in a conclusory manner." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *vacated and remanded sub nom. Becerra v. Gresham*, 509 U.S. 922 (2022).

In sum, the final rule treated Hawai'i's assurances as non-existent (at worst) or as insufficient simply because EPA said so (at best). Either way, its treatment of the assurances was arbitrary and capricious. *See Higgins*, 183 F.4th at 685; *State Farm*, 463 U.S. at 43, 48.

EPA did not just fail to acknowledge or engage with Hawai'i's assurances—it also failed to explain *why* they were inadequate. That is, EPA never explained how the State could have assuaged the agency's Takings

Clause concerns. This omission is particularly damaging to the final rule. EPA cannot simply declare that a State's assurances are "unsatisfactory," and then "fail to explain adequately the [basis for its decision] so as to allow corrective action by [the State]." *Bethlehem Steel Corp. v. EPA*, 638 F.2d 994, 1002, 1004 (7th Cir. 1980); *accord State Farm*, 463 U.S. at 48 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). Any other approach would force States to engage in a "crystal ball inquiry" about what constitutes a sufficient assurance. *Bethlehem Steel*, 638 F.2d at 1004 (quoting *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1306 (9th Cir. 1977)). And requiring States to perform this kind of aimless guesswork—with the threat of an imposed federal plan if they guess wrong, *see* 42 U.S.C. § 7410(c)(1)—would be patently "inconsistent with . . . the ideals of reasoned decision making" and the cooperative federalism framework of the Clean Air Act. *Bethlehem Steel*, 638 F.2d at 1004 (quotation omitted).

### C. EPA failed to consider how disapproving a retirement deadline based on the mere possibility of a Takings Clause violation would undermine the structure and goals of the Clean Air Act.

The agency's partial disapproval was arbitrary and capricious for an even more fundamental reason. EPA concluded only that the Hill and Kahului retirements *might* violate the Takings Clause, and, as a result, might also be "prohibited by . . . Federal or State law" and should therefore be disapproved

for lack of necessary assurances. 91 Fed. Reg. at 31941–43 (citing 42 U.S.C. § 7410(a)(2)(E)(i)). EPA acted arbitrarily because it failed to grapple with how disapproval on such speculative grounds would undermine the structure and objectives of the Clean Air Act.

When an agency fails to consider how its action is consistent with the design and "strong interest[s]" of the relevant statute, it overlooks an important aspect of the problem. *See Nat'l Urb. League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020); *see also Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("Whether an agency has overlooked 'an important aspect of the problem' . . . turns on what a relevant substantive statute makes 'important.'"). Here, the Clean Air Act and its implementing regulations reveal "strong interest[s]" in (1) State-led selection of enforceable control measures and (2) cost-effective haze regulation that improves visibility impairment at designated Class I areas. *See Ross*, 977 F.3d at 777; *see also Texas v. EPA.*, 690 F.3d 670, 684 (5th Cir. 2012) (noting that State discretion is an "essential part" of the Clean Air Act). EPA never considered how disapproving retirements based on uncertain and theoretical Takings Clause concerns would conflict with both interests.

*First*, EPA overlooked how its approach interferes with States' statutory discretion to include enforceable source retirements in their SIPs. The Clean Air Act authorizes States to adopt "*enforceable* emission limitations and other

control measures, means, or techniques . . ., as may be necessary or appropriate" to achieve reasonable progress. 42 U.S.C. § 7410(a)(2)(A) (emphasis added). These measures may include enforceable source retirements, a point that even EPA declined to dispute in the final rule. 91 Fed. Reg. at 31945–46. Indeed, the Regional Haze Rule requires a State to consider "source retirement and replacement schedules" as part of its long-term strategy. 40 C.F.R. § 51.308(d)(3)(v)(D); *id.* § 51.308(f)(2)(iv)(C) (same). And Section 7410(g) of the Clean Air Act authorizes temporary suspensions of enforceable emission reduction measures, such as retirement deadlines, that appear in a SIP—an implicit recognition that SIPs may contain enforceable retirements that would not have occurred but for their inclusion in the plan. 42 U.S.C. § 7410(g)(1).

If a source's last-minute revocation of consent gave EPA grounds to disapprove a source retirement based on speculative Takings Clause concerns, a source retirement could never be reliably enforceable. By definition, a retirement is not "enforceable" unless it can be *enforced*—*i.e.*, carried out even when a facility owner later decides it would rather not retire. But EPA's approach turns the Clean Air Act's enforceability mandate into a Catch-22: A retirement deadline must be enforceable, but it can never actually be enforced.

Specifically, EPA's approach undermines the enforceability of source

retirements by encouraging precisely the kind of gamesmanship that Hawaiian Electric displayed here. On the agency's view, a State and a facility owner could agree to retirement in lieu of additional technology-based controls, only for the owner—who would have an economic interest in delaying regulation—to unilaterally render the retirement "forced" by revoking consent well after SIP submission. Indeed, that owner could, as Hawaiian Electric did here, obtain SIP disapproval even while making clear that it was objecting not only to a given retirement, but to its obligation to reduce haze-forming emissions altogether. *See* § I.A.1. It then would become "incumbent upon" the State to provide assurances that neither State nor Federal law precluded the retirement. *See* 91 Fed. Reg. at 31943 (citing 42 U.S.C. § 7410(a)(2)(E)). And if the State could not satisfy EPA's speculative and inchoate concerns, *see* § I.B, it would mean EPA disapproval of the SIP for failure to include necessary assurances.

The risk that EPA's approach would encourage this type of gamesmanship is neither hypothetical nor limited to this case. *Contra* 2-ER-0064 (suggesting that concerns about facility owners "changing course after SIP submission" to undermine retirement deadlines are "based on speculation" (internal quotation marks omitted)). EPA recently relied on a supposed lack of necessary assurances to propose disapproval of Colorado's regional haze SIP, citing a utility's purported revocation of consent to the proposed retirement of

a coal-fired power plant. *See* 90 Fed. Reg. 31926, 31939 (July 16, 2025). The revocation of consent in that case was remarkably similar to the one at issue here. The utility did not claim to revoke its consent until three years after Colorado had submitted its SIP, and it cited the same grid reliability concerns that Hawaiian Electric invoked in its August 2025 letter. *Id.* at 31938. Wyoming provides another example. *See* 91 Fed. Reg. 34589 (June 8, 2026). There, citing vague resource adequacy concerns, a plant owner ostensibly "withdr[ew] its consent" to a retirement deadline that EPA had included in Wyoming's FIP *twelve years ago*. *Id.* at 34592. EPA has relied on this supposed revocation of consent to propose removing the retirement from the FIP. *Id.* at 34589.

Because EPA's approach would render source retirements functionally unenforceable, it would disfavor such retirements in the eyes of the States. A State can hardly be expected to rely on a source retirement if the facility owner holds a unilateral veto over the retirement's enforceability, and therefore over the approvability of the underlying SIP. And when "EPA's action amounts to an insistence [against] a particular control measure," the action is arbitrarily "inconsistent with the principles of cooperative federalism" that underpin the Clean Air Act. *Texas*, 690 F.3d at 684. Accordingly, before EPA proceeded with a partial disapproval based on the speculative possibility of a Takings

Clause violation, it was obligated to think twice about whether its action was consistent not only with Congress' recognition that enforceable source retirements are a permissible emission-reduction measure, *see* 42 U.S.C. § 7410(g)(1), but also with the States' discretion to adopt "whatever mix of emission limitations [they] deem[] best suited to [their] particular situation[s]" and that comply with the Act's requirements. *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975). EPA did not address these problems with its approach, and it therefore overlooked an important aspect of the problem.

*Second*, EPA never considered how an approach that effectively disfavors retirements can be consistent with the Clean Air Act's emphasis on cost-effective haze regulation. In crafting the four-factor reasonable progress test, Congress directed States to account for the compliance costs associated with haze reduction, indicating a legislative judgment that visibility improvements should be cost-conscious. 42 U.S.C. § 7491(g)(1). And in certain circumstances, retirements can be the most cost-effective means for reducing haze. After all, Hawaiian Electric itself opted for the Hill and Kahului retirements given the purported "high costs of controls and fuel[] switches." 5-ER-0868. But if the enforceability of a retirement deadline were always subject to the whims of a facility owner, then a State would be hard-pressed to include such deadlines in SIPs. This would deprive States of one of the most

direct and effective tools for reducing haze pollution. Instead, the State would be limited to the same technology-based controls and fuel switches that Hawaiian Electric initially sought to avoid based on costs. *Id.* The end-result is that haze reduction would be less efficient, less effective, and more expensive—precisely the outcomes Congress directed the States to avoid.

In sum, because EPA's approach to retirement disapprovals threatened to undermine key features of the Clean Air Act, EPA was required to consider whether its proposed action was consistent with the "strong interest[s]" outlined in that statute. *Ross*, 977 F.3d at 777. It did not do so, and it therefore acted arbitrarily. *See id.* Moreover, even if the statute did not explicitly emphasize these interests, EPA nevertheless had to consider them because the Public Interest Organizations' comment letter flagged how EPA's proposed action would undermine cost-effective and State-led haze regulation. 2-ER-0164–66. EPA entirely ignored those comments—an omission that was itself arbitrary and capricious. *See Higgins*, 183 F.4th at 685.

* * *

EPA's conclusion that the Hill and Kahului retirements might violate the Takings Clause was arbitrary and capricious. EPA improperly concluded that the retirements could violate the Takings Clause, because the retirements were not "forced" in any relevant sense, and the agency overlooked an important

aspect of the problem, *i.e.*, the just-compensation requirement for a Takings violation. EPA also erred by disregarding the State's assurances that no Takings Clause violation would occur. And notwithstanding those errors, EPA's analysis suffered from a more fundamental flaw, because the agency failed to consider how disapproving a facility retirement based on a speculative Takings Clause concern conflicted with the foundational objectives of the Clean Air Act. These flaws independently justify vacatur of the final rule.

## II. EPA arbitrarily rejected the rest of the SIP's long-term strategy based on supposed flaws with the Hill and Kahului retirements.

Although the final rule focused primarily on the Hill and Kahului retirements, EPA did not disapprove just those retirements. It also disapproved Hawai‘i's *entire* long-term strategy, along with its associated reasonable progress goals and federal land manager consultation requirements. 91 Fed. Reg. at 31946. This means that EPA's disapproval extended to Hawai‘i's proposed fuel switch at Puna, the technology-based controls and optional retirements at Maalaea, and the retirement of the main boiler at Mauna Loa. *Id.*; *see* 2-ER-0097–98.

But the agency never rationally justified the blanket sweep of its disapproval. And the only justification it did provide—the absence of necessary assurances about the Hill and Kahului retirements—plainly did not apply to Puna, Maalaea, or Mauna Loa. EPA also ignored comments noting

that the approval was overbroad. So, EPA's decision to disapprove the entire long-term strategy was arbitrary and capricious.

### A. EPA did not explain why it disapproved control measures at non-retiring facilities and facilities that Hawaiian Electric does not own.

In the final rule, EPA failed to explain why it was disapproving all the SIP's proposed control measures, rather than just the Hill and Kahului retirements. This was arbitrary and capricious, because EPA must explain why each "disapproved provision would interfere with an applicable requirement of the [Clean Air] Act." *See Luminant Gen. Co. LLC v. EPA,* 714 F.3d 841, 858–59 (5th Cir. 2013); *accord State Farm*, 463 U.S. at 48 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."). Here, the final rule scarcely mentioned the control measures at Puna, Maalaea, and Mauna Loa, and it certainly did not identify any provision of the Clean Air Act with which those measures interfered.

Moreover, the limited rationale that EPA did provide for its disapproval plainly did not apply to any of these facilities. The final rule's only justification for disapproving the long-term strategy—and the associated reasonable progress goals and consultation requirements—was that Hawai‘i had "not provide[d,] as part of the [SIP,] the necessary assurances" that the "forced" retirements at Hawaiian Electric's Hill and Kahului plants would

comport with the Takings Clause. 91 Fed. Reg. at 31945. But the 2024 SIP did not contemplate any retirements at Puna. Instead, it proposed a "[f]uel switch . . . to [ultra-low-sulfur diesel] for the plant's boiler by four years from permit issuance." 3-ER-0343. So, EPA's retirement-centric rationale could not possibly apply to Puna.

Furthermore, while the 2024 SIP did contemplate retirements at Maalaea, it expressly structured those retirements as one of two available alternatives: The facility could either retire select boilers or retrofit them with selective catalytic reduction technology. 3-ER-0444–46. The Maalaea retirements were therefore "optional," and as EPA itself recognized in the final rule, "optional" retirements "do[] not pose a risk of a taking" under its proffered constitutional theory. 91 Fed. Reg. at 31943 n.7.

As for Mauna Loa, the 2024 SIP did include an enforceable retirement deadline for the main boiler. 3-ER-0451. But Hawaiian Electric does not own that facility, *see* 91 Fed. Reg. at 7215, and nothing in the record indicates that Mauna Loa has revoked its consent to retirement of the main boiler. So, EPA's Takings-based rationale—which hinged entirely on Hawaiian Electric's supposed revocation of consent to the Hill and Kahului retirements—also did not apply to Mauna Loa.

EPA's failure to justify the breadth of its disapproval is unsurprising,

given that it lacked any record basis on which to do so. The 2024 SIP did not call for any retirement deadlines at Puna. 3-ER-0443–44. Mauna Loa is not a Hawaiian Electric facility, so Hawaiian Electric's purported revocation of consent had no bearing on the enforceable retirement of Mauna Loa's main boiler. *See* 91 Fed. Reg. at 7215. And EPA *admitted* that the "optional" Maalaea retirements would not implicate the Takings Clause. 91 Fed. Reg. at 31943 n.7. Thus, this is not a case in which the agency simply failed to connect the dots in the record. Rather, it is a case in which no dots existed in the first place.

To be sure, the Clean Air Act gives EPA discretion as to the breadth of its SIP disapproval, allowing the agency to disapprove a SIP "in whole or in part." 42 U.S.C. § 7410(c)(1)(B). But even where a statute grants an agency discretion, the agency must engage in "'reasoned decisionmaking' within th[e] boundaries" of that discretion. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)); *accord State Farm*, 463 U.S. at 48. Here, that means EPA must reasonably explain its decision as to each SIP provision that it disapproves. *See Luminant Generation Co.*, 714 F.3d at 858–59. Because EPA did not (and indeed could not) do so here, it exercised its discretion arbitrarily.

### B. EPA did not respond to significant comments noting that its disapproval was overbroad.

EPA's failure to explain its disapprovals of the Puna, Maalaea, and Mauna Loa control measures was exacerbated by its failure, once more, to acknowledge comments criticizing the overbreadth of its proposed disapproval.

As noted above, *see* § I.A.2, an agency acts arbitrarily when it fails to consider and respond to significant comments received during the notice-and-comment period. *See Higgins*, 183 F.4th at 685. Here, the Public Interest Organizations commented that EPA's necessary-assurances rationale did not justify disapproving control measures at Puna, Maalaea, or Mauna Loa, and that the agency's wholesale disapproval of the long-term strategy was therefore improper. 2-ER-0138–43. These were significant comments because, had EPA adopted them, the agency would have had to preserve at least part of the proposed long-term strategy. *See Am. Mining Cong.*, 965 F.2d at 771. But EPA scarcely acknowledged the Public Interest Organizations' comments about overbreadth in the final rule. 2-ER-0097–98.

With respect to Puna and Maalaea, EPA first asserted that "comments related to . . . non-shutdown measures . . . are not relevant to our action." 2-ER-0081, 0090. By making this assertion, EPA simply proved the Public Interest Organizations' point. If "non-shutdown measures" were "not relevant" to the final rule, then EPA should not have disapproved those

measures in the final rule. But it did. The agency's only other response on this front was to invoke its rationale for disapproving the Hill and Kahului retirements. 2-ER-0098 ("[B]ecause Hawai[ʻ]i did not include necessary assurances regarding the unconsented closures at [Hill and Kahului], the EPA cannot approve the long-term strategy."). But as discussed above, the agency's rationale with respect to Hill and Kahului simply did not apply to Puna or Maalaea, so it did not justify the breadth of EPA's partial disapproval. *See* § II.A.

With respect to Mauna Loa, EPA's analysis was even skimpier. The agency did not mention Mauna Loa once in the final rule, or in its responses to public comments. Instead, it seemed to justify its disapproval of the Mauna Loa retirement solely by reference to its rationale for disapproving the Hill and Kahului retirements. 2-ER-0097. And as discussed above, the rationale for disapproving the Hill and Kahului retirements did not apply to a non-Hawaiian Electric facility like Mauna Loa. *See* § II.A.

In sum, because EPA failed to respond to comments identifying key flaws in the scope of its partial disapproval, that disapproval was arbitrary and capricious. *See Higgins*, 183 F.4th at 685.

## III. Vacatur is the appropriate remedy.

This Court should vacate EPA's partial disapproval. "[V]acatur and

remand is the default remedy" when this Court "holds an agency action unlawful." *Montana Wildlife Fed. v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). Remand without vacatur is appropriate only in exceptional circumstances. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 1014 (9th Cir. 2025).

To determine if vacatur is appropriate, a court considers (1) "the seriousness of the agency's errors" and (2) the "disruptive consequences" of vacatur. *Id.* at 1015 (quoting *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022)). Both factors weigh in favor of vacatur here.

EPA committed serious errors that permeate the final rule. It overlooked or ignored significant record evidence to conclude that the Hill and Kahului retirements might violate the Takings Clause. It disregarded how its action would create disfavored and unenforceable control measures under the Clean Air Act. *See Texas*, 690 F.3d at 684, 686 (vacating as arbitrary and capricious an EPA action that relegated certain control measures to second-class status). It demanded assurances from the State, only to dismiss them out of hand with no explanation. It inexplicably applied its rationale for disapproving the retirements at Hill and Kahului to disapprove unrelated control measures at other facilities. And then it ignored public comments identifying each of the foregoing flaws. These are not minor mistakes that the

agency could simply "correct [on remand] and then (re)enact the same policy." *Kaweah Delta Health Care Dist. v. Becerra*, 123 F.4th 939, 953 (9th Cir. 2024).

Vacatur would not be disruptive. It would "minimally affect the [regulatory] status quo," *Am. Sec. Ass'n, Citadel Sec. LLC v. SEC*, 147 F.4th 1264, 1279 (11th Cir. 2025), for Hawaiian Electric because it would not trigger automatic approval of the 2024 SIP. And as for EPA and Hawai'i, remand without vacatur would be far more disruptive, because it would not pause EPA's two-year timeline to prepare a FIP, 42 U.S.C. § 7410(c)(1), or the State's concurrent process to draft a revised SIP that would moot EPA's FIP obligation. So, absent vacatur, both parties would expend considerable time and resources accommodating a partial disapproval that this Court had already ruled unlawful. The Court should avoid these disruptive consequences and vacate the final rule.

## CONCLUSION

This Court should grant the petition and vacate the partial disapproval of Hawai‘i's 2024 SIP.

**Dated:** November 13, 2026

_/s/ Abirami Vijayan_
Abirami Vijayan
Sarah A. Buckley
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 836-9866
avijayan@nrdc.org
sbuckley@nrdc.org

*Counsel for Petitioner Natural Resources Defense Council*

_/s/ Christopher A. Meyer_
Christopher A. Meyer
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
(917) 410-8753
cmeyer@earthjustice.org

Benjamin Chagnon
Earthjustice
1250 I St. NW, Fl. 4
Washington, DC 20005
(202) 745-5210
bchagnon@earthjustice.org

Isaac H. Moriwake
Earthjustice
850 Richards St., Suite 400
Honolulu, HI 96813
(808) 599-2436

*Counsel for Petitioners National Parks Conservation Association, Sierra Club, and Coalition to Protect America's National Parks*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-4688 & 26-4704

I am the attorney or self-represented party.

**This brief contains** 12,451 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated ______.
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Christopher A. Meyer **Date** 11/13/2026
*(use "s/[typed name]" to sign electronically-filed documents)*