**NOS. 26-4688, 26-4704**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

STATE OF HAWAI‘I,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*,

HAWAIIAN ELECTRIC COMPANY, INC.
*Intervenor*.

NATIONAL PARKS CONSERVATION ASSOCIATION et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

HAWAIIAN ELECTRIC COMPANY, INC.
*Intervenor*.

Petitions for Review of a Decision of the
U.S. Environmental Protection Agency,
Dkt. No. EPA-R09-OAR-2025-0152

# OPENING BRIEF OF PETITIONER STATE OF HAWAI‘I

ANNE E. LOPEZ
Attorney General of Hawai‘i

MELISSA J. KOLONIE
LYLE T. LEONARD
Deputy Attorneys General

Department of the Attorney General
425 Queen Street
Honolulu, Hawai‘i 96813
Telephone: (808) 586-0618
Email: melissa.j.kolonie@hawaii.gov
lyle.t.leonard@hawaii.gov

# TABLE OF CONTENTS

**I. INTRODUCTION** .......... **1**

**II. JURISDICTION AND VENUE** .......... **3**

**III. STATEMENT OF THE ISSUES** .......... **3**

**IV. STATEMENT OF THE CASE** .......... 4

A. Legal background .......... 5

*1. The Clean Air Act* .......... *5*

*2. EPA's implementing regulations and guidance* .......... *7*

*3. Takings jurisprudence* .......... *8*

B. Hawaii's SIP revision .......... 9

C. EPA proceedings .......... 12

**V. SUMMARY OF ARGUMENT** .......... **16**

**VI. STANDARD OF REVIEW** .......... **18**

**VII. ARGUMENT** .......... **18**

A. The Necessary Assurances Clause does not authorize EPA to disapprove a SIP based on an unconstitutional taking, no matter how likely to occur .......... 19

1. The Necessary Assurances Clause does not authorize EPA to (1) disapprove SIPs based on "potential" violations of

state or federal law or (2) to select control measures on behalf of the State ....19

2. The Necessary Assurances Clause is concerned with concrete implementation barriers, not bare legal violations with adequate remedies at law ....21

3. State is not prohibited by the Takings Clause from carrying out a SIP if property owners have adequate means to obtain compensation ....23

4. Hawai‘i provides property owners with an adequate means to obtain compensation for takings .... 26

B. Even if the Necessary Assurances Clause allows EPA to disapprove a SIP on takings grounds, the agency's exercise of that authority was unlawful....26

1. EPA cannot ignore necessary assurances provided by a State in timely comments submitted to the agency on a proposed disapproval action....27

2. Hawai‘i provided necessary assurances that SIP closure deadlines for power plant boilers will not effect physical takings....29

3. Hawai'i provided necessary assurances that SIP closure deadlines for the six boilers at issue will not effect regulatory takings ....30

a. EPA demanded an unreasonable degree of certitude that a regulatory taking would not result from implementation of the SIP....31

b. There is no reasonable possibility that a regulatory taking will occur....36

C. Even assuming EPA had valid grounds to disapprove enforceable boiler closure deadlines, its disapproval of other SIP components was arbitrary ....41

D. EPA's Final Rule sets a precedent that allows Facilities to evade the Requirements of the Act ....................................................44

E. Vacatur is the appropriate remedy ....................................................45

**VIII. CONCLUSION ..........................................................................................46**

# TABLE OF AUTHORITIES

## CASES

*Arizonans for Official English v. Arizona,*
520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ................................31

*Appolo Fuels, Inc. v. United States,*
381 F.3d 1338 (Fed. Cir. 2004) ..................................................................34

*Ass'n of Irritated Residents v. U.S. E.P.A.,*
790 F.3d 934 (9th Cir. 2015) .......................................................................31

*Austin v. City & Cty. of Honolulu,*
840 F.2d 678 (9th Cir. 1988) ................................................................ 19, 26

*BCCA Appeal Group v. EPA,*
355 F.3d 817 (5th Cir. 2003) ................................................................ 27, 32

*Bridge Aina Le'a, LLC v. Land Use Comm'n,*
950 F.3d 610 (9th Cir. 2020) ......................................................33, 36, 37, 39

*Cedar Point Nursery v. Hassid,*
594 U.S. 139, 141 S.Ct. 2063, 210 L.Ed.2d 369 (2021) ..............................9

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.,*
526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999) .......................24, 32

*Colony Cove Properties, LLC v. City of Carson,*
888 F.3d 445 (9th Cir. 2018) ..................................................................37, 40

*Colorado v. EPA,*
10th Cir. Case No. 26-09515 (filed Mar. 4, 2026) .......................................37

*Concrete Pipe & Prods. of California, Inc. v. Constr. Laborers Pension Trust,*
508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) .........................34, 39

*CRV Enterprises, Inc. v. United States,*
626 F.3d 1241 (Fed. Cir. 2010) ...................................................................30

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215, 142 S.Ct. 2228, 213 L.Ed.2d 545 (2022) ..............................31

*DW Aina Le'a Dev., LLC v. State Land Use Comm'n*,
148 Hawai`i 396, 477 P.3d 836 (2020) ........................................9, 23, 24, 26

*Eastern Enterprises v. Apfel*,
524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) ..............................32

*Edmundson v. Borough of Kennett Square*,
4 F.3d 186 (3d Cir. 1993) ..........................................................................31

*El Comité Para el Bienestar de Earlimart v. EPA*,
786 F.3d 688 (9th Cir. 2015) ................................................................. 28, 44

*First English Evangelical Lutheran Church v. Los Angeles Cnty., Cal.*,
482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) .................................23

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
559 U.S. 280, 130 S.Ct. 1396, 176 L.Ed.2d 225 (2010) ...............................22

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*,
452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) ....................................32

*Horne v. Dep't of Agric.*,
576 U.S. 351, 135 S.Ct. 2419, 192 L.Ed.2d 388 (2015) ..............................29

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150, 136 S.Ct. 1288, 194 L.Ed.2d 414 (2016) ..............................35

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) ................................33

*Knick v. Twp. of Scott, Pennsylvania*,
588 U.S. 180, 139 S.Ct. 2162, 204 L.Ed.2d 558 (2019) ....................... passim

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) ............. 9, 33, 34, 40

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369, 144 S.Ct. 2244, 219 L.Ed.2d 832 (2024) ........................ 18, 31

*Lucas v. S.C. Coastal Council,*
505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) .......................33, 37

*Luminant Generation Co., LLC v. EPA,*
675 F.3d 917 (5th Cir. 2012) ..................................................................20

*Michigan v. United States Dep't of Energy,*
191 F.4th 677 (D.C. Cir. 2026)................................................................35

*Montana Wildlife Fed'n v. Haaland,*
127 F.4th 1 (9th Cir. 2025) .....................................................................40

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.,*
463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ..................................41

*Murr v. Wisconsin,*
582 U.S. 383, 137 S.Ct. 1933, 198 L.Ed.2d 497 (2017) .................33, 34, 36

*Nat. Res. Def. Council, Inc., Project on Clean Air v. E.P.A.,*
478 F.2d 875 (1st Cir.).............................................................................31

*Ohio v. EPA,*
603 U.S. 279, 144 S.Ct. 2040, 219 L.Ed.2d 772 (2024) .............................3

*Oklahoma v. EPA,*
605 U.S. 609, 145 S.Ct. 1720, 222 L.Ed.2d 214 (2025) .............................3

*Palazzolo v. Rhode Island,*
533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) .............................33

*Penn Cent. Transp. Co. v. City of New York,*
438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) ..................................33

*Pennsylvania Coal Co. v. Mahon,*
260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) .......................................30

*Phillips v. Wash. Legal Found.*,
524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) .............................9

*Plano v. Baker*,
504 F.2d 595 (2d Cir. 1974) .......................................................................31

*Pollinator Stewardship Council v. U.S. E.P.A.*,
806 F.3d 520 (9th Cir. 2015) .....................................................................45

*Rith Energy, Inc. v. United States*,
270 F.3d 1347 (Fed. Cir. 2001) .........................................................34, 39

*Rondeau v. Mosinee Paper Corp.*,
422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975) .....................................24

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ...............................23

*Safe Air For Everyone v. EPA*,
488 F.3d 1088 (9th Cir. 2007) ...................................................................18

*Sierra Club v. EPA*, D.D.C.
Case No. 1:23-cv-01744, Doc. 73-1 (Jan. 9, 2026).............................. 11, 13

*Southern Cal. Edison v. Orange Cty. Transp. Auth.*,
96 F.4th 1099 (9th Cir. 2024).....................................................................9

*Train v. NRDC*,
421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975) ...................................20

*Union Elec. Co. v. EPA*,
427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976) .................................20

*United States v. Cent. Eureka Mining Co.*,
357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228 (1958) .................................29

*United Water Conservation Dist. v. United States*,
2026 WL 253050 (Jan. 28, 2026)...............................................................30

*Weinberger v. Romero-Barcelo,*
456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ..................................23

*West Virginia v. E.P.A.*
597 U.S. 697, 142 S.Ct. 2587, 213 L.Ed.2d 896 (2022) ..............................35

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,*
473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) ....................24, 25, 26

**UNITED STATES CONSTITUTION**
U.S. Const. amdt. V, cl. 6. .........................................................................8

**UNITED STATES CODE (U.S.C.)**

5 U.S.C. § 706(2) ........................................................................................45

5 U.S.C. § 706(a)(2)(A) ..............................................................................18

42 U.S.C. § 7401(a)(3)...................................................................................5

42 U.S.C. § 7410(l) ........................................................................................5

42 U.S.C. § 7410(a)(1)...................................................................................5

42 U.S.C. § 7410(a)(2)(A) ......................................................................6, 14, 21

42 U.S.C. § 7410(a)(2)(E)...........................................................................2, 3

42 U.S.C. § 7410(a)(2)(E)(i).....................................................................passim

42 U.S.C. § 7410(a)(2)(E)(iii)........................................................................22

42 U.S.C. § 7410(a)(2)(J) ...............................................................................5

42 U.S.C. § 7410(c) .........................................................................................5

42 U.S.C. § 7410(c)(1)...................................................................................21

42 U.S.C. § 7410(k)(1)(B) ..............................................................................6

42 U.S.C. § 7410(k)(2) .......... 6

42 U.S.C. § 7410(k)(3) .......... 1, 6, 41

42 U.S.C. § 7410(k)(4) .......... 6

42 U.S.C. § 7416 .......... 5

42 U.S.C. § 7472(a) .......... 6

42 U.S.C. § 7491(a)(1) .......... 1, 5

42 U.S.C. § 7491(a)(4) .......... 7

42 U.S.C. § 7491(b)(1) .......... 8

42 U.S.C. § 7491(b)(2) .......... 5, 14

42 U.S.C. §7491(g)(1) .......... 21

42 U.S.C. § 7491(g)(5) .......... 6

42 U.S.C. § 7607(b)(1) .......... 3

**CODE OF FEDERAL REGULATIONS (C.F.R.)**

40 C.F.R. § 51.308(f) .......... 7, 12, 14

40 C.F.R. § 51.308(f)(2) .......... 7

40 C.F.R. § 51.308(f)(2)(i) .......... 8

40 C.F.R. § 51.308(f)(2)(iv)(C) .......... 8

40 C.F.R. § 51.308(f)(3) .......... 7

40 C.F.R. § 51.308(f)(vi)(A) .......... 7

40 C.F.R. § 51.308(i) .......... 8

## FEDERAL REGISTER

*Air Plan Approval; Virginia; Repeal of Existing Stationary Source Regulations*, 91 Fed. Reg. 31,922, 31,924 (May 29, 2026) ........................................................28

*Extension of the State Implementation Plan Due Date for the Regional Haze Third Implementation Period*, 91 Fed. Reg. 331 (Jan. 6, 2026) ..............................12

## OTHER AUTHORITIES

*Black's Law Dictionary* 1212 (6th ed. 1990)........................................................22

Dep't of Energy, *Tri-State Generation and Transmission Association et al. Regarding Craig Station*, Order No. 202-25-14B, at 29-36 (June 24, 2026), https://www.energy.gov/ documents/order-addressing-arguments-raised-rehearing-202-25-14b ..........................................................................................35

*Establishing Haleakalā National Park,* Pub. L. No. 86-744, 74 Stat. 881 (Sept. 13, 1960) ..........................................................................................6

*Establishing predecessor to Hawai'i Volcanoes National Park*, Pub. L. No. 64-171, 39 Stat. 432 (Aug. 1, 1916) ..........................................................6

## HAWAI'I REVISED STATUTES

HRS § 661-1(2)..........................................................................................26

## HAWAI'I CONSTITUTION

Haw. Const. art. I, § 20 ..........................................................................8

# I. INTRODUCTION

Hawaiʻi Volcanoes National Park and Haleakalā National Park are among the country's most majestic public lands. Each Park is a culturally and environmentally significant place that is home to globally unique flora and fauna. A half-century ago, Congress amended the Clean Air Act to add a Regional Haze program, which sets "a national goal" to "prevent[]" and "remedy[]" the "impairment of visibility" in the Parks, among other places. 42 U.S.C. § 7491(a)(1). After years of study, the State of Hawaiʻi adopted and submitted to the U.S. Environmental Protection Agency (EPA) a plan to implement this program. The Clean Air Act directs that EPA "shall approve such submittal if it meets all of the applicable requirements." 42 U.S.C. § 7410(k)(3).

Yet EPA partially disapproved Hawaii's plan, for reasons that are legally and factually flawed. As the State was developing its action plan, the Hawaiian Electric Company—seeking to avoid the cost of power-plant emissions controls that would be needed to improve visibility—voluntarily committed to shut down some of its old, inefficient, and unreliable boiler equipment by a date certain. 2-ER-183; 2-ER-216. Consistent with EPA regulations and guidance at the time, Hawaiʻi included enforceable closure dates in the State Implementation Plan (SIP) it submitted to EPA. Then, in 2025, with the SIP still under federal review, Hawaiian Electric asked EPA to take "action to disapprove the SIP" because "[r]ecent tariffs" imposed by a

new President, "changes in renewable tax incentives" made by a new Congress, "and projects that have been delayed or cancelled" made it "more crucial than before that the Company has the flexibility to continue operating these [boilers] past the current deadlines if necessary." 3-ER-449-50. EPA obliged Hawaiian Electric's request and partially disapproved the State's SIP, though not for any of those reasons.

Instead, EPA coupled a misreading of the Clean Air Act to a slipshod Takings Clause analysis and concluded that Hawai'i failed to supply "necessary assurances" that it "is not prohibited by any provision of Federal or State law from carrying out" the SIP. 42 U.S.C. § 7410(a)(2)(E). Though purporting not to decide whether the closure of Hawaiian Electric's boilers effects a taking of the company's property, EPA faulted Hawai'i for not proving the negative. But EPA had no response when the State identified a threshold flaw in the agency's reasoning: even if Hawai'i were to commit "a violation of the Takings Clause," the availability of just compensation in state court would assure that Hawaiian Electric "was not entitled to injunctive relief," *Knick v. Twp. of Scott*, 588 U.S. 180, 199 (2019), of the sort that could "prohibit" the State "from carrying out [the] implementation plan," 42 U.S.C. § 7410(a)(2)(E). Apart from that dispositive flaw in reasoning, EPA misconstrued the substantive law of takings, the property law of Hawai'i, and the agency's narrow role in reviewing SIP submissions for compliance with statutory requirements.

"The Clean Air Act envisions States and the federal government working together to improve air quality." *Ohio v. EPA*, 603 U.S. 279, 286 (2024). There is nothing cooperative, however, about tying the sufficiency of a state's assurances to an idiosyncratic constitutional theory espoused by the EPA Administrator—a theory that, if adopted, could only serve to worsen air quality. Instead, by disapproving Hawaii's entire long-term strategy, not just the closure provisions, EPA has left the State's SIP for this planning period making *no* progress toward improving visibility.

Because Hawai‘i gave necessary assurances that it can carry out its Regional Haze SIP, the State respectfully asks this Court to vacate EPA's partial disapproval.

## II. JURISDICTION AND VENUE

The Court has jurisdiction to review "final action taken[] by the Administrator under [the Clean Air Act]." 42 U.S.C. § 7607(b)(1). Venue is proper because this Court is "the appropriate circuit" to review a "locally or regionally applicable action" on a SIP submitted by Hawai‘i. *Id.*; *see Oklahoma v. EPA*, 605 U.S. 609, 620 (2025).

## III. STATEMENT OF THE ISSUES

1. Whether EPA lacks authority to disapprove a SIP based on the prospect of Hawai‘i taking private property for public use, where the State's provision of an adequate remedy to obtain compensation assures that it "is not prohibited … from carrying out [its] implementation plan," 42 U.S.C. § 7410(a)(2)(E)(i), by the Takings Clause of the Fifth Amendment or its counterpart in the Hawai‘i Constitution.

2. If EPA has authority to disapprove a SIP based on the possibility of Hawai‘i taking private property, whether the agency erred in exercising that authority here because the State provided "necessary assurances," *id.*, that no taking will result from enforcing the closure deadlines for six Hawaiian Electric power plant boilers.

3. If EPA has authority to disapprove certain closure deadlines in the SIP and properly exercised that authority, whether the agency erred by also disapproving other elements of the Regional Haze SIP submitted by Hawai‘i.

## IV. STATEMENT OF THE CASE

Hawai‘i adopted several pollution-control measures under state law and, in accordance with the Clean Air Act, submitted those measures for EPA's approval as part of the State's SIP. The control measures included, among other things, enforceable closure deadlines for six boilers at Hawaiian Electric power plants. Following public notice and comment, EPA approved some parts of the SIP and disapproved others. Hawai‘i and nongovernmental organizations each challenge the disapproval portion of EPA's decision, which rested solely on the agency's determination that Hawai‘i had not provided necessary assurances that the enforced closures would not effect takings in violation of the federal or state constitution.

## A. Legal background

### *1. The Clean Air Act*

The Clean Air Act establishes a regime of cooperative federalism under which "air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) … is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Although States are not compelled to regulate sources of air pollution within their borders, doing so in accordance with the Act's minimum standards is a precondition to avoid a federal implementation plan. *Id.* §§ 7410(c), 7416.

Participating States "shall, after reasonable notice and public hearing, adopt and submit to" EPA, 42 U.S.C. § 7410(a)(1); *see also id.* § 7410(*l*), pollution-control measures that, among other things, "meet the applicable requirements of" the Act's "visibility protection" provisions, *id.* § 7410(a)(2)(J), better known as the Regional Haze program. The Regional Haze SIP must "contain such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal," *id.* § 7491(b)(2), of "the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution," *id.* § 7491(a)(1). Hawai'i Volcanoes National Park and Haleakalā National Park are mandatory class I Federal areas because each "exceed[s] six thousand acres in size"

and was "in existence on August 17, 1977." *Id.* § 7472(a); *see also id.* § 7491(g)(5); Pub. L. No. 86-744, 74 Stat. 881 (Sept. 13, 1960) (establishing Haleakalā National Park); Pub. L. No. 64-171, 39 Stat. 432 (Aug. 1, 1916) (establishing predecessor to Hawaiʻi Volcanoes National Park). The "control measures" needed for a SIP to meet the national visibility goal must be "enforceable." 42 U.S.C. § 7410(a)(2)(A).

When a State submits a Regional Haze SIP, EPA first confirms the plan's completeness, 42 U.S.C. § 7410(k)(1)(B), and then has one year to "act on the submission," *id.* § 7410(k)(2), by approving, disapproving, partially approving, or conditionally approving it, *see id.* § 7410(k)(3), (4). The agency "shall approve such submittal as a whole if it meets all of the applicable requirements of" the Clean Air Act, or "may approve [it] in part and disapprove [it] in part" when only "a portion of the plan … meets all the applicable requirements." *Id.* § 7410(k)(3).

One of those "applicable requirements" is that the submitting State provide:

> **necessary assurances that the State** (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and **is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof**).

42 U.S.C. § 7410(a)(2)(E)(i) (emphases added). This requirement, hereinafter called the Necessary Assurances Clause, is the only requirement at issue in this case.

### *2. EPA's implementing regulations and guidance*

Congress directed EPA to issue regulations to achieve the national visibility goal. 42 U.S.C. § 7491(a)(4). Those regulations segment the Regional Haze program into planning periods and ask States to adopt and submit "periodic comprehensive revisions" of their Regional Haze SIPs in each period. 40 C.F.R. § 51.308(f). EPA issued a federal implementation plan for Hawai'i for the initial planning period and later approved Hawaii's Regional Haze progress report as a SIP revision for that period. 8-ER-1800. This case concerns Hawaii's SIP revision for the second planning period, which runs from 2018 to 2028. The precedent set in this case could impact state planning and EPA rulemaking in future planning periods.

Among the core elements of a Regional Haze SIP are a "long-term strategy" to address visibility impairment, 40 C.F.R. § 51.308(f)(2); and "reasonable progress goals" expected to be achieved by the end of the planning period if the long-term strategy is executed, *id.* § 51.308(f)(3). The long-term strategy and the reasonable progress goals are keyed to the uniform rate of progress in visibility improvement "that would need to be maintained during each implementation period in order to attain natural visibility conditions by the end of 2064." *Id.* § 51.308(f)(vi)(A). In developing a long-term strategy, the State must consider, among other things, "the remaining useful life of any potentially affected anthropogenic source of visibility impairment," *id.* § 51.308(f)(2)(i), as well as "[s]ource retirement and replacement

schedules," *id.* § 51.308(f)(2)(iv)(C). States also must consult with the appropriate manager of federal public lands (here, the National Park Service). *Id.* § 51.308(i).

In 2019, EPA issued "guidelines to the States … on appropriate techniques and methods for implementing" SIP revisions for the second planning period. 42 U.S.C. § 7491(b)(1); *see* 2-ER-86-173. That guidance contemplates States exempting an individual source of visibility-impairing pollution from some or all control measures only if the SIP incorporates an "enforceable requirement" for the source to close by a date certain. 2-ER-113; *see also* 2-ER-127 ("To the extent such a requirement is being relied upon for a reasonable progress determination, the measure would need to be included in the SIP and/or be federally enforceable."). A 2021 internal memorandum again underscored that "[a]nticipated source shutdowns" may be included in a SIP to "achieve the emission reductions that are necessary to make reasonable progress." 3-ER-536.

***3. Takings jurisprudence***

The Fifth Amendment to the U.S. Constitution provides that "nor shall private property be taken for public use, without just compensation." U.S. Const. amdt. V, cl. 6. The Hawai'i Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." Haw. Const. art. I, § 20. Both provisions "protect[] rather than create[] property interests," and "the existence of a property interest is determined by reference to existing rules or understandings that

stem from an independent source such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998); *see Southern Cal. Edison v. Orange Cty. Transp. Auth.*, 96 F.4th 1099, 1104 (9th Cir. 2024).

Both the federal and state constitutions secure the right to just compensation for "physical" and "regulatory" takings. *Lingle v. Chevron U.S.A.*, 544 U.S. 528, 537-38 (2005); *DW Aina Le'a Dev't v. State Land Use Comm'n* (*DW*), 477 P.3d 836, 837 n.1 (Haw. 2020). The distinction boils down to "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery v. Hassid* (*Cedar Point*), 594 U.S. 139, 149 (2021).

**B. Hawaii's SIP revision**

In 2022, Hawai'i adopted and submitted to EPA a comprehensive SIP revision for the second Regional Haze planning period. 8-ER-1626. The State's submission was the result of a multi-year administrative process in which it solicited and took account of evolving information from Hawaiian Electric—the privately owned utility serving most of the State—about the compliance costs of various control measures and the company's preferences.

The main human-caused sources of visibility impairment in the Parks are sulfur dioxide and nitrogen dioxide emissions from Hawaiian Electric's power plants. 8-ER-1708-9 In the atmosphere, these pollutants are converted into fine

sulfate and nitrate particles that scatter sunlight and create regional haze. 8-ER-1643.

To identify the human-caused sources with the greatest potential to impair visibility in the Parks, the State did a screening analysis of Hawaii's large stationary anthropogenic sources. 8-ER-1630. The Kahului power plant on Maui Island accounted for more than 80% of the potential sulfate contribution (and a substantial share of the potential nitrate contribution) to regional haze in Haleakalā National Park—which is only 16 miles away from the plant. 8-ER-1708-9; 8-ER-1701. The Kanoelehua-Hill power plant on Hawaiʻi Island accounted for roughly 80% of the potential contribution of both sulfate and nitrate particles to visibility impairment at Hawaiʻi Volcanoes National Park (again, only 16 miles away from the plant). 8-ER-1708-9; 8-ER-1701.

Four Kahului boilers (fuel-burning vessels) and two Kanoelehua-Hill boilers burn bunker fuel, a thick and heavy residual oil typically used to power ocean liners and tankers. 8-ER-1730, 1732. These six boilers range in age from 49 to 75 years, with an average age of 63 years. 6-ER-1159, 1161.

The State proposed to require Hawaiian Electric to burn cleaner fuel starting in 2025 and install pollution-control devices by 2027. 2-ER-211, 214. The company, citing the costs of those measures, countered by offering to permanently shut down all six boilers by the end of 2027 without changing fuels or installing

pollution controls in the interim. Retiring these boilers comported with the company's stated "belie[f] that solar, wind and energy storage resources will help to lower cost of electricity relative to fuel oil." 7-ER-1525; *see also* 4-ER-830-1. The State and Hawaiian Electric agreed to federally enforceable air permit conditions requiring the shutdown of these units, 2-ER-216, and Hawaiʻi revised the company's operating permits accordingly, 3-ER-367. The National Park Service expressed support for the enforceable closure dates. 8-ER-1812; *see also* 8-ER-1816 (National Park Service comment received in support of 2024 SIP revision measures).

Hawaiian Electric took a different approach at a third power plant, Maʻalaea. There, the company asked to retain the option to either install emissions controls for some aging and inefficient generating units, or else retire them by an enforceable closure date. 3-ER-325. The State obliged and incorporated that choice into the SIP. 3-ER-555.

When Hawaiian Electric asked for a one-year extension of the closure deadlines for the Kahului and Kanoelehua-Hill boilers, until the end of 2028, the State agreed. It revised Hawaiian Electric's operating permits a second time, 3-ER-367, and submitted a substitute SIP revision to EPA in 2024, 8-ER-1761. Meanwhile, EPA entered into a consent decree that compelled it to act on Hawaii's SIP submission by September 2025. *Sierra Club v. EPA*, D.D.C. Case No. 1:23-cv-01744, Doc. 53-1, at 8 (Jun. 12, 2024) (Consent Decree).

In late 2024, Hawaiian Electric asked the State for yet another revision to its permits, to allow the six Kahului and Kanoelehua-Hill boilers to operate for a few more years, if necessary to ensure reliability of the electric grid. 3-ER-329. After consulting with EPA, the State declined to further amend the company's permits or revise its SIP. 3-ER-368 (explaining that, given the constraints of EPA's consent decree, a reanalysis and resubmission "would result in EPA issuing Hawaii a 'Finding of Failure to Submit'" a SIP); Consent Decree, *supra*, at 11. Hawai'i expressed openness to considering Hawaiian Electric's proposal as part of the third Regional Haze planning period, which runs from 2028 through 2038. 3-ER-368.[1]

## C. EPA proceedings

Hawaiian Electric began direct discussions with EPA near the start of EPA's new Administration. Hawaiian Electric abruptly reversed course on the enforceable closures. Despite having negotiated with the State for shutdowns in lieu of installing pollution controls, Hawaiian Electric began referring to the shutdowns and controls as "unnecessary"—suggesting the company should not have to do either. 3-ER-396. On August 25, 2025, Hawaiian Electric met with EPA without Hawai'i present. 3-

---

[1] At that time, SIP revisions for the third planning period were due on July 31, 2028, before the closure deadline for the six boilers. EPA recently extended the submission deadline until July 31, 2031, though the planning period continues to run from 2028 to 2038. *Extension of the State Implementation Plan Due Date for the Regional Haze Third Implementation Period*, 91 Fed. Reg. 331 (Jan. 6, 2026) (amending 40 C.F.R. § 51.308(f)).

ER-423-37. Hawai'i later obtained a copy of the meeting's slide presentation which showed EPA and the company privately discussing disapproval of Hawaii's SIP based on a takings rationale EPA had debuted in a SIP proceeding for the State of Colorado. 3-ER-431. Four days after the meeting, Hawaiian Electric sent a letter citing "[r]ecent tariffs, changes in renewable tax incentives, and projects that have been delayed or cancelled," and asking the agency to either negotiate revisions to the consent decree or disapprove the closure deadlines in the State's SIP. 3-ER-449. EPA decided to do both. *See* Stipulation, *Sierra Club v. EPA*, D.D.C. Case No. 1:23-cv-01744, Doc. 73-1 (Jan. 9, 2026) (extending deadline for action on SIP to May 15, 2026). *See also* 1-ER-7.

In February 2026, EPA proposed to partially approve and partially disapprove Hawaii's SIP revision for the second planning period. 3-ER-544. In particular, the agency proposed to disapprove the State's long-term strategy, reasonable progress goals, and consultation with the National Park Service, all due to two alleged problems with the enforceable closure dates for the six boilers at the Kahului and Kanoelehua-Hill plants. 3-ER-558, 559, and 561. The first alleged problem was that "unconsented[2] source closures, without just compensation, could violate the Takings Clause of the U.S. Constitution and possibly comparable provisions of state

[2] It is undisputed that at the time the State adopted the measures in question, none of the enforced boiler closures were "unconsented." 3-ER-557-fn.82.

law, and that Hawaii has not provided the necessary assurances that such violations would not occur." 3-ER-557. The second alleged problem was that unconsented source closures are not permissible "control measures," 42 U.S.C. § 7410(a)(2)(A), or "other measures," *id.* § 7491(b)(2), that can be included in a SIP. 3-ER-558. EPA abandoned this second rationale in its final action. 1-ER-5-6.

Two days after publishing its proposed action, and nearly five years after the deadline for States to submit revisions for the second planning period, *see* 40 C.F.R. § 51.308(f), EPA updated its 2019 guidance with a two-page memorandum stating that, due to "significant increases in electricity demand and strain on the reliability of the United States' electrical grid, … EPA does not support states encouraging or forcing an electric generating facility to close in order to comply with the Clean Air Act's … regional haze requirements." 2-ER-95. However, EPA neither proposed nor finalized a grid-reliability justification for disapproving Hawaii's SIP. 1-ER-5.

Indeed, the record shows no grid-reliability concern beyond Hawaiian Electric's unsupported assertions. In 2023, the company had submitted an "Integrated Grid Plan" to the Hawaiʻi Public Utilities Commission for approval. 4-ER-610. The company's plan incorporated the very boiler closures at issue here. 4-ER-830. Indeed, even after Hawaiian Electric complained to EPA in August 2025 about reliability challenges, the company submitted adequacy-of-supply

reports to the Hawai'i Public Utilities Commission that did not mention the need to cancel, delay, or change its plans as to the six boilers. 3-ER-470-89. Hawaiian Electric has never retracted its assertion reporting that these sources themselves are unreliable given their age. 4-ER-735 ("fossil fuel-based generators are currently more than 60 years old … and experiencing higher outage rates.").

In May 2026, EPA finalized its partial approval and partial disapproval of the SIP. 1-ER-1. As it had proposed to do, the agency disapproved the State's long-term strategy, its reasonable progress goals, and its consultation with the National Park Service, all based on the possibility that enforced closure of the six boilers would constitute a taking. 1-ER-6. First, EPA reasoned that any "violation" of the Takings Clause would "prohibit" Hawai'i "from carrying out" the boiler shutdowns. 1-ER-2. Second, EPA reasoned that "[o]nce [it] and Hawaii received notification that Hawaiian Electric withdrew its consent for the enforceable closure provisions contained in the long-term strategy, … it became incumbent upon Hawaii to provide the necessary assurances that EPA approval of these unconsented source closure[s] would not amount to a taking without just compensation." 1-ER-3.

EPA professed not to be deciding whether any taking would in fact occur. 1-ER-3 ("We are not adjudicating constitutional claims in this final rule."). Still, the agency opined that a boiler closure would "appropriate the Company's right to control the operation of its facilities" and "force the utility to change the use of its

property," making it "reasonable to conclude" that a physical taking would occur. 1-ER-4. EPA also opined that "it is not possible for [it] to ensure" that a boiler closure "will not constitute a regulatory taking under the U.S. Constitution" because closure "would diminish the units' economically beneficial use and value." 1-ER-5.

## V. SUMMARY OF ARGUMENT

EPA erred by not approving Hawaii's Regional Haze SIP in its entirety. The agency's only rationale for disapproval—the potential that enforced closures of six boilers across two power plants could effect unconstitutional takings—is flawed in many respects. Even if it were valid, that rationale did not justify EPA's disapproval of other elements of the State's long-term strategy, or its reasonable progress goals.

1. Takings are not a valid concern for EPA under the Necessary Assurances Clause because they cannot "prohibit" Hawai'i "from carrying out" a SIP. Hawai'i has an adequate procedure for property owners to recover just compensation for any takings in court. That means a taking does not violate the Takings Clause of the State Constitution. And, although takings without concurrent compensation do *violate* the Takings Clause of the Federal Constitution, Hawaii's procedure for recovering just compensation after the fact means "there is no basis to enjoin [its] action effecting a taking," *Knick*, 588 U.S. at 201—and thus no possibility that a taking will *prohibit* the State from carrying out its SIP.

2. Regardless, Hawai‘i provided EPA necessary assurances that takings would not result from enforced closure deadlines for the six boilers. Precedent and practice required EPA to consider assurances the State gave in comments on EPA's proposed action. There, Hawai‘i explained why mandatory retirement dates for power-plant equipment cannot effect "physical" takings; no private property is invaded or seized. The State also explained why EPA is not positioned to assess whether a "regulatory" taking may occur; and why, in any event, there is no reasonable possibility that such a taking could occur in this instance.

3. Even if EPA had valid grounds to disapprove the portion of the SIP that allegedly raised a takings concern, the agency still erred by disapproving *all* the SIP's pollution-control measures. The remaining elements of Hawaii's long-term strategy for Regional Haze, and its reasonable progress goals for improving visibility in the Parks, are severable from the enforced closure dates for six boilers. Approving those elements better aligns with the Clean Air Act's goals than disapproving them.

EPA's partial disapproval of Hawaii's SIP should be vacated and remanded.

## VI. STANDARD OF REVIEW

This Court reviews EPA's final action on a SIP submission using the Administrative Procedure Act (APA) standard of review. *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1095 (9th Cir. 2007); *see also* 5 U.S.C. § 706(a)(2)(A) ("The reviewing court shall … hold unlawful and set aside agency action, findings, and

conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."). "[C]ourts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Where the best reading of a statute is that it delegates a measure of discretion to an agency, the Court must still "police the outer statutory boundaries of th[e] delegation[], and ensure that agencies exercise their discretion consistent with the APA." *Id.* at 404.

## VII. ARGUMENT

EPA rested its partial disapproval of Hawaii's SIP on multiple errors of law, any of which alone warrants vacatur of the disapproval portion of EPA's action. If this Court upholds EPA's disapproval of six boiler closures against all those challenges, it still should vacate the agency's disapproval of other aspects of the State's comprehensive SIP revision.

### A. The Necessary Assurances Clause does not authorize EPA to disapprove a SIP based on a taking, no matter how likely to occur.

This case is easily resolved based on one feature of the Necessary Assurances Clause, one feature of the Takings Clause, and one feature of Hawai‘i law. First, the Necessary Assurances Clause asks whether a State "is prohibited … from carrying out [an] implementation plan." 42 U.S.C. § 7410(a)(2)(E)(i). Second, "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *Knick*, 588 U.S. at 201. Third,

"Hawaii procedures are adequate" for obtaining just compensation. *Austin v. City & Cty. of Honolulu*, 840 F.2d 678, 681 (9th Cir. 1988). Combined, these features assure that Hawai'i will not be prohibited from carrying out closures of these six boilers in its Regional Haze SIP, even if a taking ensues. In directing EPA to the inverse-condemnation remedy available under state law for any taking, Hawai'i showed that EPA abused its discretion under the Necessary Assurances Clause and provided the agency an incontrovertible assurance that it can implement the SIP it submitted.

**1. The Necessary Assurances Clause does not authorize EPA to (1) disapprove SIPs based on "potential" violations of state or federal law or (2) to select control measures on behalf of the State**

First, the mere potential the SIP could violate Federal or State law is not sufficient to warrant disapproving the SIP under the Necessary Assurances Clause, regardless of what kind of potential violation is at issue. Congress could have chosen terms requiring a state to provide assurances that implementation of a SIP "could not" or "may not possibly result in" violations of law. But Congress did not. The statute requires a state to provide necessary assurances that it "*is not prohibited* by any provision of Federal or State law from carrying out such implementation plan or portion thereof." 42 U.S.C. § 7410(a)(2)(E)(i) (emphasis added). Yet in Hawaii's case, EPA imposed a heightened standard, untethered to the statutory text, when it proposed to find Hawai'i had failed to provide necessary assurances because closure

of the boilers "*could*" violate the Takings Clause. 1-ER-1. And based its final rule on the reasons stated in the proposal. 1-ER-6. This requires a state to forecast whether the state *might possibly* violate federal or state law in the course of implementing a SIP, not to assure EPA that implementation is not *prohibited*, as the statute requires. EPA's role is "confine[d] . . . to the ministerial function of reviewing SIPs for consistency with the Act's requirements," *Luminant Generation Co. LLC v. EPA*, 675 F.3d 917, 921 (5th Cir. 2012), and here, EPA went beyond that.

Second, nothing in the Necessary Assurances Clause authorizes EPA to invalidate the state's choice of which emissions controls to employ. The Act requires states to include in their SIPs all necessary "enforceable emissions limitations and other control measures[.]" 42 U.S.C. § 7410(a)(2)(A). And the states have "wide discretion in formulating [their] plan[s]." *Union Elec. Co. v. EPA*, 427 U.S. 246, 250 (1976). EPA has "no authority to question the wisdom of a State's choices of emissions limitations[.]" *Train v. NRDC*, 421 U.S. 60, 79 (1975). Every control measure that a state may select affects a property owner's exclusive right to control its property or alters the owner's operations in some manner. In the visibility protection subpart of the Act, Congress explicitly required states to consider the "cost of compliance" on owners, and the "remaining useful life of any existing source[.]" 42 U.S.C. §7491(g)(1). The text of the Act shows that Congress either

explicitly or foreseeably required states to select among enforceable control measures—including enforceable retirement dates—that impose costs on owners and impact the remaining useful life of the source. Following a disapproval, EPA may promulgate a Federal Implementation Plan such that the state loses its right to select control measures. *See* 42 U.S.C. §7410(c)(1). But, when the disapproval is based on an ill-conceived and speculative rationale, it turns the cooperative federalism scheme of the Act on its head allowing EPA to choose the control measures it deems appropriate for the state.

**2. The Necessary Assurances Clause is concerned with concrete implementation barriers, not bare legal violations with adequate remedies at law.**

According to EPA, "[t]he best reading" of the Necessary Assurances Clause "is that the EPA may not approve a SIP revision that *risks violating* Federal or State law in the course of implementation and for which the State has not provided necessary assurances that there will be no such *violation*." 1-ER-2. (emphases added). That is not the best reading of the statute.

The Necessary Assurances Clause does not use the word *violate* or *violation*. It uses the verb *prohibit*, which means "[t]o forbid by law" or "to prevent." BLACK'S LAW DICTIONARY 1212 (6th ed. 1990). To "prohibit" a State "from carrying out" a plan, 42 U.S.C. § 7410(a)(2)(E)(i), is to prevent the plan's execution. Congress's

(and thus, EPA's) concern is not the State's potential legal liability, but whether the State can deliver the goods by executing its SIP in toto.

This reading is confirmed by the balance of the Necessary Assurances Clause. The not-prohibited-by-law-from-carrying-out-the-plan assurance is nestled between assurances that the State "will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan," 42 U.S.C. § 7410(a)(2)(E)(i); and an assurance that, "where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision," *id.* § 7410(a)(2)(E)(iii). Some of these assurances are legal in nature ("authority," "responsibility"), while others relate to resources ("personnel," "funding"). But all of them "drive at the same end." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 289 (2010). Congress's "self-evident" intent in demanding these various assurances is to avoid placing responsibility for pollution control in the hands of States that face barriers to executing their plans. *Id.* at 288.

Certainly, many legal violations can be barriers to SIP implementation. But not *every* legal violation has the potential to be such a barrier. To prevent SIP implementation, a violation must "support[] the grant of injunctive relief," which is "a remedy whose basis in the federal courts has always been" conditioned on the

"inadequacy of legal remedies." *Rondeau v. Mosinee Paper*, 422 U.S. 49, 57 (1975) (citation modified); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."). If an adequate remedy at law is guaranteed, there is no concern that a court will halt implementation of a SIP due to that violation of law. Therefore, EPA must approve the State's submission regardless of whether the law at issue may be violated in the course of implementing the SIP. Such is the case here.

**3. A State is not prohibited by the Takings Clause from carrying out a SIP if property owners have adequate means to obtain compensation.**

The Takings Clauses of the Federal and Hawai‘i Constitutions do not secure a right to private property simpliciter, but only a "right to recover just compensation" for an "otherwise proper [governmental] interference amounting to a taking." *First English Evangelical Lutheran Church v. Cty. of Los Angeles*, 482 U.S. 304, 315 (1987) (interpreting Fifth Amendment); *accord DW*, 477 P.3d at 844 (under Hawai‘i Constitution, "a taking is not a legal injury, but rather an entitlement to just compensation"). Just compensation for a taking is a remedy at law. *City of Monterey v. Del Monte Dunes at Monterey*, 526 U.S. 687, 710-11 (1999).

In 1985, the U.S. Supreme Court held that there is no "violation of the [Federal Constitution's Takings Clause] until the [property] owner has unsuccessfully attempted to obtain just compensation through the procedures provided by the State"

for inverse condemnation. *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985); *see generally Knick*, 588 U.S. at 186 ("Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant." (citation omitted)).

This is how the *Hawai'i* Constitution continues to be interpreted by the Hawai'i Supreme Court. *See DW*, 477 P.3d at 844 (2020 decision explaining that a claimant in an "[a]ction for the recovery of compensation" has not suffered a "legal injury" (citation omitted)). Thus, any taking of property by the State in the course of implementing its SIP cannot "violate" the Hawai'i Constitution; and, even accepting EPA's "best reading" of the Necessary Assurances Clause, *but see supra* Part VII.A.2, the agency erred by invoking state law as a basis for SIP disapproval. EPA "acknowledge[d]," and did not dispute, "commenters' assertions that the takings clause of the Hawaii State Constitution is not violated until a property owner has tried and failed to obtain just compensation for a taking." 2-ER-43-fn.28. Yet, inexplicably, the agency continued to maintain that it lacked necessary assurances "with respect to … state law." *Id.*

Takings jurisprudence under the *Federal* Constitution changed in 2019, but not in a way that changes the appropriate result in this case. In *Knick v. Township of Scott*, the U.S. Supreme Court overruled its 1985 decision in *Williamson County*

and held that when a "government takes private property without paying for it, that government has violated the Fifth Amendment … without regard to subsequent state court proceedings" for recovery of just compensation. 588 U.S. at 189. At the same time, though, the Supreme Court took care to distinguish constitutional *violations* from *prohibitions* on takings:

> A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it. That does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities.
>
> * * *
>
> We conclude that a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim … at that time. That does not as a practical matter mean that government action or regulation may not proceed in the absence of contemporaneous compensation.

*Id.* at 185, 202. Just compensation is a remedy at law whose adequacy "means that injunctive relief will be foreclosed." *Id.* at 205. Thus, if a property owner has an adequate means to recover just compensation after the fact, there is no "risk [of] having government action invalidated" on account of a taking, and "no basis" for EPA to find that the State may be prohibited from carrying out a SIP. *Id.* at 185, 201.

#### 4. Hawai‘i provides property owners with an adequate means to obtain compensation for takings.

Hawai‘i, “like every other State besides Ohio, provides a state inverse condemnation action” for property owners to recover just compensation for a taking by the State. *Knick*, 588 U.S. at 186; *see also* Haw. Rev. Stat. § 661-1(2); *DW*, 477 P.3d at 844. This Court squarely held in 1988 that the State’s procedure for property owners to recover just compensation for takings is “adequate.” *Austin*, 840 F.2d at 681. At that time, the adequacy of Hawaii’s inverse-condemnation remedy was understood to avert a violation of the Federal Constitution. *Id.* at 680-81 (discussing *Williamson County*, 473 U.S. at 194-95). But even now that the Supreme Court has held otherwise, the adequacy of Hawaii’s compensatory remedy continues to assure that a taking will not prohibit the State from carrying out its SIP. *See supra*, Part VII.A.3. EPA has not disputed the adequacy of Hawaii’s inverse-condemnation procedure.

### B. Even if the Necessary Assurances Clause allows EPA to disapprove a SIP on takings grounds, the agency’s exercise of that authority was unlawful.

Even if EPA can disapprove a SIP on takings grounds under some circumstances, the Court still should grant the petition and vacate EPA’s partial disapproval because the agency misconstrued the Takings Clause in this case and abused its discretion in the evidentiary showing it demanded of the State.

**1. EPA cannot ignore necessary assurances provided by a State in timely comments submitted to the agency on a proposed disapproval action.**

Some statements in the preamble to EPA's final action suggest that the agency viewed the Necessary Assurances Clause as a requirement that can be met only by information provided within the four corners of a State's original SIP submission to EPA.[3] *E.g.*, 1-ER-3 ("Without any representations from Hawaii to the contrary *in the Plan*, it is not possible for the EPA to approve the long-term strategy ..." (emphasis added)); 1-ER-4 ("Commenters do not explain or point to necessary assurances provided by Hawaii *in the Plan* …." (emphasis added)). On the other hand, EPA observed that it only "became incumbent upon Hawaii to provide the necessary assurances" at issue "after Hawaiʻi submitted the Plan to the EPA," when "Hawaiian Electric withdrew its consent for the enforceable closure provisions contained in the" State's submission. 1-ER-3. To the extent EPA argues in this Court that Hawaiʻi had to either be clairvoyant or submit a revised SIP once Hawaiian Electric changed its mind, the agency is wrong.

This Court's precedent confirms that EPA can consider necessary assurances from a State in materials provided outside the four corners of the SIP submission.

---

[3] The SIP contained an appendix listing statutory and administrative rule provisions showing Hawaiʻi had legal authority to implement the SIP. 8-ER-1784-98. The State Attorney General signed a certification stating the laws were adopted and enforceable to carry out the program. *Id.* Such certifications normally suffice for EPA to determine that no law will interfere with a State carrying out its SIP. *See, e.g., BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 844 (5th Cir. 2003).

*El Comité Para El Bienestar de Earlimart v. EPA,* 786 F.3d 688 (9th Cir. 2015). In *El Comité*, this Court upheld EPA's reliance on materials that a State provided at the agency's request after a third party alleged a violation of the Necessary Assurances Clause at the end of the comment period on EPA's proposed action. *Id*. at 700. Here, Hawai'i provided necessary assurances in its own comments on the proposed action, so EPA received the relevant materials even earlier in the approval process than it had in *El Comité*.

EPA has not changed its practice of relying on materials submitted by States outside the SIP to show compliance with the Necessary Assurances Clause. Indeed, EPA followed that practice in an action published on the same day as this one. EPA, *Air Plan Approval; Virginia; Repeal of Existing Stationary Source Regulations*, 91 Fed. Reg. 31,922, 31,924 (May 29, 2026) (deferring to opinion of Attorney General of Virginia on the proper construction of state law). And the agency had no qualms relying on a "supplemental package" sent by Arkansas after the close of the public comment period and years after the State's Regional Haze SIP submission for the second planning period. EPA, *Air Plan Approval; Arkansas; Regional Haze State Implementation Plan for the Second Implementation Period*, 91 Fed. Reg. 55,268, 55,269 (Aug. 27, 2026). It would be the height of arbitrariness for EPA to have deemed Hawaii's assurances insufficient merely because they were not provided in the SIP submission document itself.

**2. Hawai‘i provided necessary assurances that SIP closure deadlines for power plant boilers will not effect physical takings.**

The State established in its comments that no physical taking will result from the enforceable closure deadlines in its SIP. 2-ER-194-5. In saying otherwise, EPA grossly misread takings jurisprudence and adopted an extreme position that assumes governments must pay businesses for virtually any exercise of regulatory authority.

A mandatory retirement date for a boiler at a power plant does not meet the standard for a physical taking, namely, that "the government has physically taken property for itself or someone else." *Cedar Point*, 594 U.S. at 149. Closure is accomplished by the power plant owner and operator, not the State. No physical or intangible property is seized. *Cf. Horne v. Dep't of Agric.*, 576 U.S. 350, 361 (2015). State agents do not enter onto private property or authorize others to do so, unless needed to confirm and ensure compliance—and the Supreme Court has assured that this sort of time-limited inspection is not a taking. *Cedar Point*, 594 U.S. at 161-62.

Requiring a power plant to stop using a particular boiler is a "use restriction." *Cedar Point*, 594 U.S. at 148 (citing as an example of a use restriction the government's order to close a gold mine in *United States v. Central Eureka Mining*, 357 U.S. 155, 168 (1958)). Hawai‘i is not appropriating a distinct property right created or recognized by state law. Operating certain boilers on a parcel of property is not "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Id.* at 150. In attempting to recast the enforced closure

as an appropriation of Hawaiian Electric's "right to control the operation of its facilities," 1-ER-4, EPA is at odds not only with the overwhelming weight of precedent but also the position of the U.S. Solicitor General. *See* U.S. Br. in Opp. 10-12, *United Water Conservation Dist. v. United States*, S.Ct. No. 15-523, 2026 WL 253050 (Jan. 28, 2026) (rejecting argument that "right to operate" facility is a distinct right appropriated by a closure order). If EPA's view were adopted, physical takings would swallow regulatory takings whole and make essentially every interference with business operations compensable. *CRV Enters. v. United States*, 626 F.3d 1241, 1248 (Fed. Cir. 2010). "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 413 (1922) (Holmes, J.).

Hawaii's plan to enforce these closure dates will not effect a physical taking.

**3. Hawai'i provided necessary assurances that SIP closure deadlines for the six boilers at issue will not effect regulatory takings.**

Hawai'i explained in its comments why no regulatory taking will result from enforceable closure deadlines in its SIP. 2-ER-195-6. In rejecting that explanation, EPA again misconstrued takings jurisprudence and also held the State to an unreasonably demanding factual burden.

### *a. EPA demanded an unreasonable degree of certitude that a regulatorytaking would not result from implementation of the SIP.*

The Clean Air Act does not define the phrase "necessary assurances," which appears nowhere else in the U.S. Code. *Assurance* ordinarily means "something that inspires or tends to inspire confidence." *Natural Res. Def. Council, Inc., Proj. on Clean Air v. EPA*, 478 F.2d 875, 883 (1st Cir. 1973) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961)). "The term 'necessary' has a range of meanings—from 'essential' to merely 'useful,'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 282 (2022), but in this context it is most naturally interpreted as "sufficient"—as in, sufficient to inspire confidence.

EPA has a measure of discretion in judging when a State's assurances are sufficient. *See Ass'n of Irritated Residents v. EPA*, 790 F.3d 934, 941-47 (9th Cir. 2015).[4] But EPA must exercise a measure of humility because it "simply does not have the background or experience to finally decide issues that give pause even to federal courts despite their familiarity with that area of the law," *Edmundson v. Bor. of Kennett Square*, 4 F.3d 186, 193 (3d Cir. 1993), and "the administrator does not have an adequate procedure for finding facts," *Plano v. Baker*, 504 F.2d 595, 599

---

[4] In *Association of Irritated Residents*, this Court reviewed deferentially EPA's choice to defer to the interpretation of an "ambigu[ous]" state law advanced by the Attorney General of the SIP-submitting State. 790 F.3d at 942. That choice was sound. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 76-77 & n.30 (1997). But no deference is owed to *EPA's* independent interpretation of any law, state or federal. *See Loper Bright*, 603 U.S. at 394.

(2d Cir. 1974). *Cf. BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 844 n.37 (5th Cir. 2003) (upholding EPA's approach of first approving SIP instead of "anticipat[ing] a court's findings," and then responding appropriately to court decision after it issued). Whatever discretion the Necessary Assurances Clause grants EPA, it does not extend so far as to authorize disapproval of a SIP based on speculation about applicability of federal or state laws other than the Clean Air Act—particularly constitutional provisions with which EPA has no special familiarity or expertise. The APA notice-and-comment period contains no opportunity for discovery nor any evidentiary hearing. *See* 5 U.S.C. §553. EPA is not authorized to perform an adjudication to determine whether a takings occurred within the context of an APA public comment process.

EPA's demand that the State prove a negative on a regulatory-takings question is an abuse of whatever discretion the agency has under the Necessary Assurances Clause. Regulatory takings is "one of the most difficult and litigated areas of the law." *Eastern Enters. v. Apfel*, 524 U.S. 498, 542 (1998) (Kennedy, J., concurring in the judgment and dissenting in part). "[D]eterminations of liability" are "essentially ad hoc, factual inquiries," *City of Monterey*, 562 U.S. at 720 (citation omitted), that are ill-suited for resolution outside a courtroom. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 294-95 (1981). The Necessary Assurances Clause was not intended to address these sorts of legal determinations.

First comes the "difficult, persisting question," *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001), of how broadly to define the claimant's property interest. "[B]ecause [the] test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains," one must "define the unit of property whose value is to furnish the denominator of the fraction." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495-96 (1987). Courts use a "complex," "multifactor standard" that is property- and owner-specific. *Murr v. Wisconsin*, 582 U.S. 383, 399, 402 (2017).

After defining the relevant parcel, courts ask whether the use restriction left it "valueless," *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1020 (1992), or with only "a token interest" or an interest "attributable to noneconomic use" like conservation, *Bridge Aina Le'a v. Land Use Comm'n*, 950 F.3d 610, 628 (9th Cir. 2020). "[T]he government must pay just compensation for such 'total regulatory takings,' except to the extent that background principles of nuisance and property law independently restrict the owner's intended use of the property." *Lingle*, 544 U.S. at 538.

If the relevant parcel retains even a small amount of economic use and value after the government action, courts analyze a takings claim under "the more general" test of *Penn Central Transportation v. City of New York*, 438 U.S. 104 (1978). *Murr*, 582 U.S. at 405. Courts consider "a complex of factors, including (1) the economic

impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 582 U.S. at 393. "[E]ach has given rise to vexing subsidiary questions." *Lingle*, 544 U.S. at 539. And each of the factors calls for "a careful inquiry informed by the specifics of the case." *Murr*, 582 U.S. at 394.

EPA took this "flexible test," *Cedar Point*, 594 U.S. at 148, and applied it inflexibly against a State that was deprived of the tools it would have in a court to defend itself against a takings claim. EPA cannot make a takings determination within a SIP-approval proceeding which is an informal rulemaking in which no one (certainly not the State) has the opportunity to subpoena evidence uniquely within property owners' possession that may be highly relevant to the regulatory-takings analysis. For example, where (as here) "a business [is] engaged in a highly regulated industry, the [owner's] reasonable investment-backed expectations are an especially important consideration in the takings calculus." *Rith Energy v. United States*, 270 F.3d 1347, 1351 (Fed. Cir. 2001); *see also Concrete Pipe & Prods. of Cal. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 645 (1993). Because the owner's expectations must be not only objectively reasonable, but also subjectively held at the time property was acquired, this determination "may require a factual hearing." *Appolo Fuels v. United States*, 381 F.3d 1338, 1350 (Fed. Cir. 2004); *see also id.* at 1349 n.5. There is no possibility of such a hearing in this setting. To have its SIP

approved, a State does not have to essentially prepare for trial—with one hand tied behind its back, and the burdens of production and persuasion shifted to the government defendant—against every owner of a facility whose value might "diminish" if the SIP is implemented. 1-ER-5.

EPA's abuse of discretion is heightened given the regulatory context. States, not the federal government, exercise "control over in-state facilities used for the generation of electrical energy." *Hughes v. Talen Energy Mktg.*, 578 U.S. 150, 154 (citation omitted). A State's decision that a particular power plant (or boiler) should be phased out is not subject to revision just because the EPA Administrator believes that decision is "unduly harsh." 1-ER-5. *Cf. West Virginia v. EPA*, 597 U.S. 697, 729 (2022) ("We also find it highly unlikely that Congress would leave to agency discretion the decision of how much coal-based generation there should be over the coming decades."). This is not the first time a federal agency has probed a hidden corner of its authority hoping to circumvent the traditional federal-state balance of energy regulation. *See id.* at 724-35; *Michigan v. U.S. Dep't of Energy*, --- F.4th ---, 2026 WL 2671756 (D.C. Cir. Sept. 11, 2026).[5] EPA's latest effort should be as unsuccessful as the others.

---

[5] The Executive Branch's recent results-driven approach to takings jurisprudence is illustrated by comparing EPA's decision to the U.S. Department of Energy's recent decision rejecting a takings claim pressed by companies the Department ordered to keep open a coal-fired power plant that had been slated for retirement. *See* Dep't of Energy, *Tri-State Generation and Transmission Association et al. Regarding Craig*

***b. There is no reasonable possibility that a regulatory taking will occur.***

Even with EPA stacking the deck against Hawai'i, the administrative record shows that a regulatory taking is exceedingly unlikely to occur, and EPA arbitrarily disregarded the record.

First, the continued "*existence* of permissible uses" for the Kahului and Kanoelehua-Hill power plants defeats any claim of a "total" regulatory taking. *Bridge Aina Le'a*, 950 F.3d at 629. Hawaiian Electric's relevant parcels—the denominators of the takings fraction—at each plant almost certainly consist of the entire facilities (and the industrial-zoned land on which they sit), as opposed to the individual boilers slated for retirement. *See* 8-ER-1730-1 (listing Kanoelehua-Hill combustion turbine and five generators that continue to operate); 4-ER-753 (company's plan to convert two of the retiring Kahului boilers to synchronous condensers that improve grid reliability). All the land in question is zoned industrial, 3-ER-458, 461, so these properties could feasibly be repurposed for other uses—including energy generation that would have less, or no, impact on visibility. EPA erred by "relying on" and "incorporating" the reasoning of another recent SIP decision, 3-ER-557, where—in contrast to the Supreme Court's decision in *Murr v.*

---

*Station*, Order No. 202-25-14B, at 29-36 (June 24, 2026), https://www.energy.gov/documents/order-addressing-arguments-raised-rehearing-202-25-14b.

*Wisconsin*, 582 U.S. at 403-04—the agency refused to group "separate sources located on adjacent or contiguous property," 8-ER-1808, into a single parcel.[6].

For similar reasons, the record provides no basis for EPA to conclude that the first *Penn Central* factor—the economic impact of the government action—supports its takings analysis. The before-and-after value comparison that courts generally conduct under this factor "aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owners from his domain[.]" *Bridge Aina Le'a*, 950 F.3d at 631. This Court has observed that "diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking," that it is "aware of no case in which a court has found a taking where diminution in value was less than 50 percent," and that a reduction in value of 24.8% is "far too small to establish a regulatory taking." *Colony Cove Props. v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018). If no takings resulted on those facts, nothing in the administrative record of this case suggests that enforced closures of any or all of the six boilers will do so.

Indeed, even if the relevant parcels were just the lands housing the individual boilers, the record shows those lands will not be left "valueless." *Lucas*, 505 U.S. at 1020; *see* 3-ER-458 (tax assessment for Kahului plant showing land value of $4.1

[6] Petitions for review of this EPA decision—a disapproval of Colorado's Regional Haze SIP for the second planning period—are being heard by the Tenth Circuit. *Colorado v. EPA*, 10th Cir. Case No. 26-09515 (filed Mar. 4, 2026).

million and building value of $2.9 million); 3-ER-461 (tax assessment for Kanoelehua-Hill plant showing land value of $7.7 million and building value of $9.9 million). That would be true even if Hawaiian Electric decided to leave the land vacant, but its own planning documents show that it can convert the retired boilers to other useful purposes consistent with the SIP. 4-ER-753.

The incoherence of EPA's reasoning on economic impact is laid bare by its divergent treatment of the SIP conditions that Hawai'i imposed for the Ma'alaea power plant. Recall that, at Hawaiian Electric's request, the State gave the company a choice between paying for pollution controls at Ma'alaea or closing a portion of the plant by an enforceable deadline. *See supra*, at 11. EPA concluded (correctly) that this arrangement "do[es] not pose a risk of a taking." 2-ER-67. Despite this finding, EPA disapproved the measure anyway. 2-ER-67. But, left significant questions about its takings analysis and how it applies to enforceable closures. Like, if a mere "diminish[ment]" in the economic value of a plant makes it "not possible for the EPA to ensure" that a regulatory taking will occur? 1-ER-5. Would the State's SIP have been approved in full had Hawaiian Electric been given a choice between enforceable closure dates for the six Kahului and Kanoelehua-Hill boilers and installing pollution controls that the company told the State were not cost-effective to install given the boilers' remaining useful life? The boilers would have

shut down anyway, and the economic impact on those plants would have been the same.

Next, EPA cited no evidence of reasonable, investment-backed expectations of Hawaiian Electric that the six boilers at issue would operate past the closure dates in the SIP. The company's expectations necessarily were shaped by the longstanding regulatory regime under which Congress set, among other things, a visibility goal for the Parks. A prudent owner of a fossil fuel-fired power plant would know that "[t]he likelihood of regulatory restraint is especially high with regard to possible adverse environmental effects, … which have long been regarded as proper subjects for the exercise of the state's police power." *Rith Energy v. United States*, 270 F.3d 1347, 1351 (Fed. Cir. 2001); *see also Ruckelshaus v. Monsanto*, 467 U.S. 986, 1007 (1984); *Bridge Aina Le'a*, 950 F.3d at 634 ("Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." (quoting *Concrete Pipe & Prods. of California. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 645 (1993) (cleaned up))). And the undisputed fact that Hawaiian Electric first consented to these closure dates reveals its lack of subjective (to say nothing of objective) expectations that these old and inefficient boilers would run in perpetuity. 4-ER-580 ("These facilities were never designed to keep up with today's dynamic grid."). Moreover, Hawaiian Electric committed to these closures in its plans submitted to

the state Public Utilities Commission, for which it also requested and received near-term financial benefit from the expected closures in the form of accelerated depreciation[7] rates on the boiler equipment, to avoid “stranded costs.” 3-ER-514-5. The evidence under this *Penn Central* factor weighs against a taking as well.

Regardless, the character of the government action (the last *Penn Central* factor) would defeat any claim of a regulatory taking. The Clean Air Act’s Regional Haze program is a prime example of a “public program adjusting the benefits and burdens of economic life to promote the common good.” *Colony Cove*, 888 F.3d 445, 454 (9th Cir. 2018) (citation omitted). EPA’s suggestion that these boiler closures are “not reasonably necessary to the effectuation of a substantial public purpose,” 1-ER-5, is doctrinally misplaced because “the Takings Clause presupposes that the government has acted in pursuit of some valid public purpose.” *Lingle*, 544 U.S. at 543.

In sum, even if it were required—which it was not, *see supra*, Part VII.A.2.—Hawaii’s comments provided EPA with necessary assurances that enforcing these six boiler closures would not effect any compensable takings.

[7] EPA arbitrarily failed to consider comments concerning the accelerated depreciation rates ordered by the Hawai‘i Public Utilities Commission and whether these increased rates constitute just compensation to Hawaiian Electric for the advanced retirements of the six boilers. 2-ER-40-fn.14 A utility company “may seek just compensation for its property taken through rate setting…” *Mountain Water Co. v. Montana Dep't of Pub. Serv. Regul.*, 919 F.2d 593, 601 (9th Cir. 1990).

### C. Even assuming EPA had valid grounds to disapprove enforceable boiler closure deadlines, its disapproval of other SIP components was arbitrary.

When EPA determines that some but not all of the elements of a State's SIP are approvable, the agency can approve the "portion of the plan revision [that] meets all of the applicable requirements of" the Clean Air Act. 42 U.S.C. § 7410(k)(3). But it is arbitrary for EPA to approve only *some* of the portion of the SIP that the agency determined to meet the Act's requirements. Here, the agency did not just disapprove the enforceable closure dates for the six boilers across the Kahului and Kanoelehua-Hill; it disapproved the entirety of Hawaii's long-term strategy, all its reasonable progress goals, and its consultation with the National Park Service. EPA reasoned that those SIP elements are "related" to the enforceable closure dates for the boilers at the Kahului and Kanoelehua-Hill plants. 1-ER-5. The salient question, though, is not whether the other elements of the SIP are "related" to elements the agency did not approve. The issue is whether approving the other elements in the SIP as an interim measure better achieves the statutory purpose. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 47 (1983) (explaining that even if agency is justified in rejecting course of action "in its entirety," "standing alone" that "does not cast doubt on the need for a" more narrow "alternative way of achieving the objectives of the [statute]"). EPA gave no reasoned explanation why they would not approve the non-shutdown control measures.

If EPA's partial disapproval is upheld, Hawai'i will need to revise its approach to the Kahului and Kanoelehua-Hill plants to cure the deficiency found by the agency. But, given EPA's inconsistent approach to Hawaiian Electric's Ma'alaea plant, *see supra* at 38, curing the purported deficiency requires the State to resubmit yet another SIP to provide the company with the option to install the pollution controls the State initially proposed for the six boilers, as an alternative to enforceable closure dates—a result that would not satisfy Hawaiian Electric's desire to avoid both control measures and enforceable shutdowns, while leaving Hawai'i saddled with the burden[8] of further SIP revisions. Indeed, the 2024 SIP revision took two years and included: a technical analysis, permit modifications, negotiations with Hawaiian Electric, National Park Service consultation, and State-level public comment period. 2-ER-203-4.

---

[8] EPA recognizes the time and resources required of states to meet SIP submittal deadlines. In a different rulemaking, EPA expressed that it "does not wish to set states up to fail, especially when they have been diligently working to try to meet the submittal deadline." *Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule*, 90 Fed. Reg. 35966, 35979 (July 31, 2025). EPA went on to say that extending the SIP deadline would "enable states to devote suitable time and resources to developing approvable plans" while recognizing that plans must "meet all applicable requirements and achieve the objectives of the states and their stakeholders." *Id.* If the deadline remained in place, EPA noted "the existing deadline could needlessly embroil states and the EPA in disputes over untimely or insufficient submissions. *Id*.

Meanwhile, approving the remainder of Hawaii's long-term strategy, and its reasonable progress goals, would better serve the purpose of the Regional Haze program by making many pollution-control measures federally enforceable. By approving the State's data and methodology, including the uniform rate of progress necessary to achieve the objective of federal law, EPA seems to have recognized that anthropogenic pollution is impairing visibility in the Parks. 8-ER-1670, 1671 (approved portions of SIP showing visibility impairment levels far above natural conditions). But, by disapproving Hawaii's entire strategy and all its reasonable progress goals, EPA has rejected *any* measures for the second planning period that will make reasonable progress toward reducing that pollution.

EPA viewed any public comments related to "non-shutdown" measures—i.e., related to any element of the long-term strategy and reasonable progress goals other than the six boilers with enforceable closure dates—as "not relevant to [its] action." 2-ER-58-9. But the agency did not explain why it is irrelevant to consider whether parts of the State's long-term strategy, or its reasonable progress goals, could be approved notwithstanding the deficiency EPA identified. For example, the SIP's control measure selected for the Puna Generating Station involved a boiler fuel switch from fuel oil No. 6 to Ultra Low Sulfur Diesel. 8-ER-1765. This control measure did not involve an "unconsented" closure, yet EPA arbitrarily disapproved the entire long-term strategy and all control measures. Congress consciously chose

not to give EPA a binary choice between full approval and full disapproval of a SIP, and the agency's summary explanation for not approving other elements of the plan is arbitrary and capricious. *See State Farm*, 463 U.S. at 48 ("At the very least this alternative way of achieving the objectives of the Act should have been addressed and adequate reasons given for its abandonment."); *El Comité*, 786 F.3d at 700 (observing that "because we are" is not a "satisfactory explanation for action").

### D. EPA's Final Rule sets a precedent that allows facilities to evade the requirements of the Act

EPA's approach opens the door to manipulation by polluters seeking to avoid the cost of pollution controls. Under EPA's interpretation of the Clean Air Act, a source can evade controls by pulling a bait and switch. In negotiations with the State, the polluter may offer to retire a facility, or a unit in a facility, in lieu of implementing controls. Once the SIP is submitted to EPA, the polluter can reverse course and call the retirement "unconsented," triggering EPA's novel takings analysis. The SIP would then be disapproved, and the source would avoid both pollution controls and shutdowns.

This administrative record is a case in point. After telling the State that it preferred an enforceable closure date to pollution controls for six boilers, Hawaiian Electric reversed course, withdrew its consent to closure, then sought to avoid both pollution controls and shutdowns in a plea to EPA. *See supra* at 12-3. Hawaiian Electric indicated "it would be appropriate to determine that no further controls are

required for this period." 3-ER-400. If this Court allows EPA's action here to stand, nothing prevents Hawaiian Electric (or any other polluter) from engaging in this manipulation for future Regional Haze planning periods, or in the context of other SIPs.

The precedent is ultimately detrimental for industry, as well. To avoid the result in this case, States will insist that even facilities or units that are close to retirement install pollution controls. Both sides lose. States must expend additional time and monetary resources to conduct emissions analyses for more sources, while industry must pay to install pollution controls on equipment that they plan to retire soon. Not only is EPA's action legally impermissible, it creates a lose-lose situation for all involved—while also weakening State SIPs in contravention of Congress's national visibility goal.

### E. Vacatur is the appropriate remedy.

Remand with vacatur is the "default remedy" for federal agency action that violates the APA. *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th. Cir. 2025); *see* 5 U.S.C. § 706(2). That remedy is appropriate here because of the seriousness of the legal deficiencies Hawai'i has identified; it is either impossible or exceedingly unlikely that EPA can cure any of those "fundamental flaws" on remand. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). Moreover, vacatur

of EPA's partial disapproval would have no disruptive consequences for the agency, the State, Hawaiian Electric, any third party, or the environment.

## VII. CONCLUSION

For the foregoing reasons, the Court should grant Hawaii's petition, vacate EPA's partial disapproval of the State's Regional Haze SIP for the second planning period, and remand for further proceedings before the agency.

DATED: Honolulu, Hawai‘i, November 13, 2026.

/s/ Lyle T. Leonard
MELISSA J. KOLONIE
LYLE T. LEONARD
Deputy Attorneys General

Attorneys for Appellant
STATE OF HAWAI‘I

**NOS. 26-4688, 26-4704**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STATE OF HAWAI‘I,
*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

HAWAIIAN ELECTRIC COMPANY, INC.
*Intervenor*.

NATIONAL PARKS CONSERVATION ASSOCIATION et al.,
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

HAWAIIAN ELECTRIC COMPANY, INC.
*Intervenor*.

Petitions for Review of a Decision of the
U.S. Environmental Protection Agency,
Dkt. No. EPA-R09-OAR-2025-0152

CERTIFICATE OF SERVICE

I hereby certify that on this date the foregoing document was served upon the following individuals by CM/ECF electronic filing:

Allison Watkins Mallick
BAKER BOTTS L.L.P.
101 California Street, Suite 3200

San Francisco, CA 94111
Attorney for Intervenor
Hawaiian Electric Company, Inc.

Adam R.F. Gustafson
Christine W. Ennis
U.S. Department of Justice, ENRD
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Attorney for Respondent
United States Environmental Protection Agency

Abirami Vijayan
Sarah A. Buckley
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
Counsel for Petitioner natural Resources Defense Counsel

Christopher A. Meyer
Isaac H. Moriwake
Benjamin Chagnon
Earthjustice
48 Wall St., 15th Floor
New York, NY 10005
Counsel for Petitioners
National Parks Conservation Association, Sierra Club, and
Coalition to Protect America's National Parks

DATED: Honolulu, Hawai'i, November 13, 2026.

/s/ Lyle T. Leonard
MELISSA J. KOLONIE
LYLE T. LEONARD
Deputy Attorneys General

Attorneys for Appellant
STATE OF HAWAI'I

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 36-4688, 26-4704

I am the attorney or self-represented party.

**This brief contains** 12,406 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- (●) complies with the word limit of Cir. R. 32-1.
- ( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- ( ) complies with the length limit designated by court order dated [ ].
- ( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/Lyle T. Leonard **Date** 11/13/2026

*(use "s/[typed name]" to sign electronically-filed documents)*